**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, | |
| AMERICAN COUNCIL ON EDUCATION, | |
| ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, | |
| BROWN UNIVERSITY, | |
| CALIFORNIA INSTITUTE OF TECHNOLOGY, | Case No. _____ |
| CORNELL UNIVERSITY, | **COMPLAINT** |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
| REGENTS OF THE UNIVERSITY OF MICHIGAN, | |
| BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, | |
| TRUSTEES OF PRINCETON UNIVERSITY, and | |
| UNIVERSITY OF ROCHESTER, | |
|       Plaintiffs, | |
|    v. | |
| DEPARTMENT OF ENERGY, and | |
| CHRIS WRIGHT, in his official capacity as Secretary of the Department of Energy, | |
|       Defendants. | |

1.      This suit challenges a flagrantly unlawful action by the Department of Energy ("DOE")—slashing "indirect cost rates" for government-funded research—that is a virtual carbon copy of the National Institutes of Health ("NIH") policy that a district court has permanently enjoined, after previously granting a prompt temporary restraining order and preliminary injunction. *Massachusetts v. Nat'l Institutes of Health ("NIH")*, No. 25-CV-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), *judgment entered* (D. Mass. Apr. 4, 2025), *appeal filed* (D. Mass. Apr. 8, 2025).  DOE's action is unlawful for most of the same reasons and, indeed, it is especially egregious because DOE has not even attempted to address many of the flaws the district court found with NIH's unlawful policy.  Here, as there, if DOE's policy is allowed to stand, it will devastate scientific research at America's universities and badly undermine our Nation's enviable status as a global leader in scientific research and innovation.

2.      For decades, universities have built their research institutions on the government's commitment to fund the costs of the research it supports.  Some of those costs are "direct;" that is, they are readily attributable to specific projects.  Others are "indirect;" that is, they are necessary for the research to occur but harder to attribute to individual projects.  Specialized nuclear-rated facilities; computer systems to analyze enormous volumes of data; information-technology and utility systems providing the backbone for those efforts; and researchers and administrative staff who keep the systems running—all are critical to cutting-edge research, but their costs typically cannot be allocated to any single project.  Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

3.      Congress understood that agencies would "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates" via a bespoke process

accounting for each institution's unique cost structures and grants. 41 U.S.C. § 4708. That is why Congress gave the Executive Branch the quintessentially administrative task of identifying institution-specific metrics and did not itself set across-the-board metrics. Hence, the Office of Management and Budget ("OMB") exercised its authority to promulgate regulations requiring agencies to negotiate indirect cost rates with individual financial assistance recipients through a carefully regulated process, based on each institution's unique needs and cost structure. *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]"). For universities, the indirect cost rates are typically negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). By regulation, this negotiation yields a rate that is intended to reflect the actual, verified indirect costs incurred by the institution. Then, "[n]egotiated indirect cost rates must be accepted by all Federal agencies," unless one of the narrow exceptions applies. 2 C.F.R. § 200.414(c)(1).

4.    The purpose of this process is to ensure that the negotiated rate correctly captures the actual indirect costs incurred in the conduct of research. Differences in indirect cost rates do not reflect undeserved government subsidies; rather, institutions have different indirect cost rates because they engage in different types of research and have unique mixes of fixed and variable institutional costs that are appropriately allocated across multiple research projects or other cost objectives. Government funding agencies may deviate from the negotiated rates only in limited circumstances, and only via procedures that provide ample notice and protections to ensure that the basic terms of engagement are not changed precipitously. The regulatory framework thus

recognizes that there is no one-size-fits-all approach and that participating institutions have profound reliance interests in the negotiated rates—rates that are tailored to their circumstances and that facilitate the work that makes the United States a world leader in cutting-edge research.

5.     This is not the first time an administration has considered limiting indirect cost rates and superimposing a one-size-fits-all regime on what has long been a tailored, negotiated process. In 2017, the Administration proposed slashing the indirect cost rate to 10% for all NIH grants. The reaction in Congress was swift and bipartisan.    Congress identified serious problems immediately—observing that the proposal would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965," emphasizing that Congress had "not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray," S. Rep. No. 115-150, at 109 (2017), and concluding that this proposal was "misguided and would have a devastating impact on biomedical research across the country," H.R. Rep. No. 115-244, at 50 (2017).

6.     In February 2025, the Administration nonetheless tried the same maneuver again, and NIH issued a notice stating that it was "imposing a standard indirect cost rate on all grants of 15%." NIH, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html. A federal district court quickly enjoined that policy, finding that the Administration had not only flouted an appropriations rider that Congress had enacted in the wake of the 2017 NIH episode, but also had violated the government-wide regulations governing indirect cost rates and the reasoned decisionmaking requirements of the Administrative Procedure Act ("APA"). *NIH*, 2025 WL 702163, at *1.

7.      Now the Administration has brought a similar policy to DOE, issuing late on April 11, 2025 a new policy stating that "hereinafter, the Department will no longer use the negotiated indirect cost rate" for universities; "setting a standardized 15 percent indirect cost rate for all grant awards to" universities; and announcing that DOE "is undertaking action to terminate all grant awards to [universities] that do not conform with this updated policy."  DOE, *Policy Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025) (attached as Ex. A) ("Rate Cap Policy").  The announcement acknowledges that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards," but then states without explanation that a categorical limit on indirect cost rates of 15% is necessary to ensure DOE "is putting [funds] to appropriate use" and to "improve efficiency and curtail costs where appropriate."  The Rate Cap Policy applies this supposedly necessary limit on indirect cost rates "only with respect to" universities, not to other recipients of DOE grants.

8.      As with the NIH's similar maneuver, DOE's Rate Cap Policy is unlawful, and obviously so.  It violates the indirect-cost regulations that OMB promulgated precisely to provide needed stability, protect reliance interests, and ensure that recipients can cover the *actual costs* of conducting the research that the government has selected them to undertake.  Those regulations provide, in no uncertain terms, that the "[n]egotiated indirect cost rates must be accepted by all Federal agencies."  2 C.F.R. § 200.414(c)(1).  DOE's reading of the narrow exceptions from that mandate would render that command meaningless and effectively replace the word "must" with "may," allowing any agency to toss those negotiated rates simply by *announcing* a different across-the-board policy.  Nothing in the regulations' text remotely supports that bizarre reading.  Indeed, the Rate Cap Policy separately violates the regulations' requirement that any departure from the negotiated rate appear upfront in the notice of funding *opportunity*—a requirement that DOE

cannot evade by purporting to cancel the grants of recipients that decline to agree to its unlawful 15% rates.

9.     The Rate Cap Policy also defies the APA's reasoned-decisionmaking requirements. Although the Rate Cap Policy strings together a few sentences describing its change, absent is any genuine attempt at an *explanation*—one that would "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The Rate Cap Policy ignores that indirect costs are necessary for critical research to proceed and are distinguished from direct costs only in that they are not attributable to *just one* grant. The Policy ignores the devastating consequences of jettisoning an approach dating back to 1965—consequences that Congress itself emphasized the only other time something like this was proposed. It ignores how its across-the-board policy thwarts the very goal that DOE purports to pursue: "continuing to expand American innovation and scientific research." It ignores, as well, the reliance interests of the universities receiving federal funding—reliance interests that DOE casually destroys. *Cf. FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (if a "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests" an agency's failure to consider such factors "would be arbitrary or capricious"). The Policy likewise ignores the guidance this Court provided in striking down the NIH's virtually identical effort. Finally, the Rate Change Policy inexplicably imposes its new requirement only on universities, not other DOE grant recipients. If this approach were a sound policy necessary to protect the public fisc (it is not), DOE would have applied it more broadly—or at least explained why it targeted only universities. The contours of DOE's decision

thus "cannot be adequately explained in terms of" the explanation it provided." *Dep't of Commerce*, 588 U.S. at 784.

10.     The effects, moreover, will be immediate and devastating.  The Rate Cap Policy states unequivocally that "the Department *is undertaking* action to terminate all grant awards to IHEs that do not conform with this updated policy" (emphasis added).  That is, DOE is poised to put recipients to a choice: Either accept reductions in indirect cost rates, or face terminations. And as soon as recipients face that choice, the harm will be immediate and irreparable.  Because universities cannot sustain DOE-funded programs at the 15% indirect cost rate that DOE will now inflict, myriad critical projects—often the product of years or decades of effort—are in jeopardy of being stopped in their tracks.  These include the development of advanced nuclear and cybersecurity technologies, arms control verification mechanisms designed to reduce the risk of nuclear war, novel radioactive drugs to diagnose and treat cancer, and upgrades for the electrical grids that keep the lights on in rural communities, among many others.  Meanwhile, the human cost will be immense, as universities will have to immediately reduce staff and training programs—irreversibly damaging their academic communities, the careers of these young researchers, and the national interest in training the next generation of scientists.  Nor can the consequences of grinding vital scientific work to a halt, and stifling training, be unwound.  The pace of scientific discoveries in the national interest will be slowed.  Progress on a safe and effective nuclear deterrent, novel energy sources, and cures for debilitating and life-threatening illness will be obstructed.  America's rivals will celebrate, even as science and industry in the United States suffer.

## JURISDICTION AND VENUE

11.    This action arises under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and regulations governing federal grants. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the APA.

12.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and a Plaintiff resides in this district.

## PARTIES

13.    Plaintiff Association of American Universities ("AAU") is an association composed of 71 leading research universities with the goal of transforming lives through education, research, and innovation. AAU's member organizations are public and private research universities that are world-renowned centers of scientific and technological research and innovation. Much of their scientific work is supported by DOE grants.

14.    Plaintiff Association of Public and Land-Grant Universities ("APLU") is a membership organization that fosters a community of university leaders collectively working to advance the mission of public research universities. A core mission of the APLU is fostering research and innovation, specifically by "promoting pathbreaking scientific research."[1] The association's membership consists of over 200 research universities, land-grant institutions, and affiliated organizations across the United States. Much of their scientific work is supported by DOE grants.

---

[1] Association of Public and Land-Grant Universities, *About Us*, https://www.aplu.org/about-us/.

15.    Plaintiff American Council on Education ("ACE") is a nonprofit association composed of more than 1,600 colleges, universities, and higher education-related associations, organizations, and corporations with the goal of enabling higher education institutions to flourish. ACE's member organizations are accredited, degree-granting colleges and universities, as well as related associations, organizations, and corporations that also serve as world-renowned centers of scientific technological research and innovation.  Much of their scientific work is supported by DOE grants.

16.    Plaintiff Brown University ("Brown") is a private university located in Providence, Rhode Island.  Brown conducts fundamental and applied research directed at the forefront of DOE priorities, including research critical to the nation's current and future energy needs and security.  DOE's planned cap of 15% for indirect cost expenditures would result in an over two-million-dollar loss annually to Brown's planned research budget.

17.    Plaintiff California Institute of Technology ("Caltech") is a private university located in Pasadena, California.  Caltech is a world-class science and engineering institute that has long been at the vanguard of technological innovation.  Caltech receives substantial annual funding from DOE and currently has 83 active DOE awards and subawards.  In fiscal year 2024, Caltech expended more than $25 million in conducting research supported by DOE, with almost $8 million expended as indirect costs.  If the indirect cost rate is reduced to 15% of modified total direct costs, that would reduce the Caltech's annual indirect cost recovery by nearly $6 million.

18.    Plaintiff Cornell University ("Cornell") is a private university located in Ithaca, New York.  Cornell is a leading research institution that has been selected by the federal government to conduct a wide variety of vital forms of research on behalf of United States citizens, funded in part by agency awards, cooperative agreements, and contracts from across the

federal government, including DOE. In fiscal year 2024, Cornell expended approximately $30 million on more than 110 awards from DOE. Cornell's indirect cost rate, as negotiated with the federal government, allowed Cornell to recover approximately $8.5 million in reimbursement for those costs from DOE. Cornell's ability to conduct DOE-sponsored research during fiscal year 2025 would be significantly impaired by the reduction in the indirect cost reimbursement, estimated as a shortfall of roughly $8 million in a typical fiscal year.

19.    Plaintiff Board of Trustees of the University of Illinois ("Illinois") is a public university with its flagship campus in Urbana-Champaign, Illinois. Illinois is a leading land-grant research university and one of the largest recipients of DOE funding, having received over $122 million in fiscal year 2024. Since Illinois's negotiated indirect cost rate is 58.6%, Illinois would lose substantial dollars if its predetermined indirect cost rate were reduced to 15%.

20.    Plaintiff Massachusetts Institute of Technology ("MIT") is a private university located in Cambridge, Massachusetts. Founded to accelerate the nation's industrial revolution, MIT faculty, researchers, and graduates have invented fundamental technologies, launched new industries, and advanced human understanding of science, technology, and other areas of scholarship. MIT received $93 million from the DOE in MIT's fiscal year 2024 for performing sponsored research. MIT conducts research under 286 direct and indirect funding awards from DOE that are currently active for its fiscal year 2025. If DOE reduces the indirect costs rate to 15%, then MIT forecasts it will lose approximately $15 million to $16 million in reimbursement for costs that support DOE research over the next 12 months alone.

21.    Plaintiff Regents of the University of Michigan ("Michigan") is a public university located in Ann Arbor, Michigan. It receives substantial annual funding from DOE, which supports critical and cutting-edge research, including Michigan's nuclear research program,

advanced battery technologies, and next-generation engine and fuel technologies. Of the $81.8 million in DOE funding that the University received in fiscal year 2024, approximately $56.1 million was allocated for direct costs and $25.7 million for indirect costs. Similarly, in fiscal year 2025, the University expects to receive $61.8 million in DOE funding for direct costs, while $28.3 million is allocated for indirect costs. And over the next five years, the University anticipates receiving an average of $75.8 million from the DOE for annual direct costs. Based on the predetermined indirect cost rate of 56%, which was agreed upon by the federal government as of July 1, 2024, the University thus expects to receive approximately $42.4 million in indirect cost recovery on an annual basis. If—contrary to what the University of Michigan has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce the University's anticipated annual indirect cost recovery by $31.1 million, to $11.4 million.

22.    Plaintiff Board of Trustees of Michigan State University ("MSU") is a public university located in East Lansing, Michigan. MSU was the first land-grant university established under the Morrill Act and today is a leading global public research university. Of the $161 million in DOE funding that MSU received for fiscal year 2024, approximately $116 million was for direct costs and about $45 million was for indirect costs reimbursements. Based on the predetermined indirect cost rate of 57%, which was agreed upon by the federal government, MSU expects to receive approximately $45 million in indirect cost recovery on an annual basis from DOE. If the indirect cost rate is reduced to 15%, that would reduce MSU's anticipated annual indirect cost recovery by approximately $32 million.

23.    Plaintiff Trustees of Princeton University ("Princeton") is a private university located in Princeton, New Jersey. Princeton is a world-class research institution that aims to unite people, resources, and opportunities for the creation, preservation, and transmission of knowledge

for the benefit of the nation and humanity. Princeton has 112 DOE awards and subawards and intends to apply for additional research funding this year. In fiscal year 2024, Princeton expended approximately $32.6 million in conducting such research supported by DOE. Of this total, approximately $10 million were expended as indirect costs to support needs such as the infrastructure, research administration, compliance, and security expenses required to conduct the funded research. Princeton's negotiated on-campus indirect cost rate for fiscal year 2024 is 62%. Princeton would therefore lose substantial dollars if Princeton's predetermined indirect cost rate were reduced to 15%.

24.    Plaintiff University of Rochester ("Rochester") is a private university located in Rochester, New York. Rochester conducts groundbreaking research in a wide variety of fields, including fusion energy, quantum computer, and theoretical and experimental elementary particle physics. The University's Laboratory for Laser Energetics ("LLE") is the nation's leading university-based research center in fusion, laser science and technology, and high-energy-density science research, and operates two of the largest and most-capable government-owned lasers at any academic institution in the world. Rochester's negotiated indirect cost rate through fiscal year 2026-2027 is 51%. DOE's planned cap of 15% for indirect cost expenditures would result in an indirect cost recovery loss to Rochester of greater than $25 million.

25.    Defendant Department of Energy ("DOE") is an executive department of the federal government that is responsible for coordinating national energy policy and supporting energy research and development to advance American energy, economic, and national security.

26.    Defendant Chris Wright is Secretary of DOE. He is sued in his official capacity.

## FACTUAL BACKGROUND

### A. Indirect Cost System Structure

27.    For decades, DOE-funded research at universities has made the United States a world leader in science.  The federal government awards billions of dollars to research universities that can most effectively further DOE's goals.  In fiscal year 2023, DOE awarded more than $2.6 billion to nearly 400 different universities.

28.    DOE grants have funded scientific research that has led to innumerable scientific breakthroughs, including the discovery of the Higgs particle.  Dozens of DOE-supported scientists have earned Nobel Prizes for their groundbreaking scientific work.[2]

29.    Most DOE-funded research occurs at outside institutions, including universities. This approach allows DOE to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.

30.    DOE pursues its research goals by funding the critical scientific research of the organizational Plaintiffs' member universities and the university Plaintiffs.  At any given time, individual research universities often depend on myriad of DOE grants that support independent research projects across multiple university departments and centers.

31.    These DOE grants are issued pursuant to a well-established legislative and regulatory framework.  Congress has authorized DOE to provide for grants under various statutes, and it has directed agencies to use indirect cost rates.  *See* 41 U.S.C. § 4708.  Congress also instructed OMB to issue general guidance on fiscal administration issues.  *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]").  In turn, OMB has established uniform guidance

---

[2] DOE, *DOE Nobel Laureates*, https://science.osti.gov/About/Honors-and-Awards/DOE-Nobel-Laureates (last visited Apr. 14, 2025).

for agencies to administer grants under the agencies' purview. *See* 2 C.F.R. pt. 200 (setting forth "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). DOE has expressly adopted OMB's guidance into its own regulations. *See* 2 C.F.R. § 910.120 (adopting OMB guidance in 2 C.F.R. pt. 200).

32.    As provided by regulation, DOE's competitive grantmaking process begins with a notice of funding opportunities for a specific topic followed by new application submissions. *See* 2 C.F.R. § 200.204.

33.    After a formal review process that includes peer review, the DOE issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested (*i.e.*, drawn down) from the agency. *See* 2 C.F.R. § 200.211(b)(7) (establishing that the award must include the "[a]mount of [f]ederal [f]unds [o]bligated by this action"). An NOA is issued for the initial budget period and each subsequent budget period, and it reflects any future-year understandings about the continuation of the funded project. *See* 2 C.F.R. § 200.211(c)(1)(iv).

34.    Federal grant recipients generally do not receive lump-sum grants. Instead, they use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research.

35.    The costs of conducting DOE-funded research come in two types. The first is "direct costs"—costs that can be attributed to a specific research project. For example, the salary of a graduate student assigned to a particular research project, or the cost of a specialized piece of equipment purchased for a research project is a direct cost.

36.    The second is "indirect costs"—costs that are necessary for research but that support multiple research projects. These costs have long been reimbursed as part of federal grant funding: in 1962, Congress authorized the use of "predetermined fixed-percentage rates"

for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.

37.    "[I]ndirect costs" are comprised of "[f]acilities" and "[a]dministration" costs. 2 C.F.R. § 200.414(a). The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.* This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of buildings, including specialized facilities and laboratories. Those costs are indirect because a single building, such as a state-of-the-art nuclear facility, might house numerous research groups engaged in multiple distinct projects.

38.    The "[a]dministration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" *Id.* This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals, experts on safety and security, technical staff, and many others. These are indirect costs because a single employee or group of employees will handle these necessary administrative activities across multiple DOE grants. Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

39.    Federal regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs. *See* Appendix III to Part 200—Indirect (F & A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs). This

methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs.  As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs.  Suppose, too, that the laboratory's sole indirect cost is the cost of electricity, which costs $10,000 per year.  Because the cost of electricity ($10,000) is 10% of the overhead-bearing direct costs ($100,000), the indirect cost rate would be 10%.  Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 of electricity costs would be allocated to the second project.

40.    Federal regulations prescribe a detailed methodology for negotiating indirect cost rates.  *See* Appendix III to Part 200.  Typically, a single agency negotiates an indirect cost rate with an institution.  For universities, rates are generally negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1).

41.    That indirect cost rate then applies to all of that institution's grants across the entire federal government.  Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs.  For example, if an institution seeks to recover the cost of building maintenance, it must document those costs and then allocate those maintenance costs across research and non-research programs.

42.     The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate.   Again, this rate reflects actual, verified costs incurred by the institution.

43.     Once the federal agency agrees to an indirect cost rate, it binds the entire federal government during the period that the negotiated rate is in effect.   Typically, the negotiated rates remain in effect for one year, although in some cases they remain in effect for up to four years.

44.     After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred.   The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.

45.     DOE is required to use that negotiated indirect cost rate unless a deviation therefrom "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation" or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]."   2 C.F.R. § 200.414(c)(1).

46.     The cross-referenced provision, 2 C.F.R. § 200.414(c)(3), in turn makes clear that the negotiated rates remain the baseline and that it authorizes only specific "deviations" for individual awards or classes of awards when specified criteria are met.   In particular, that provision specifies that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."   2 C.F.R. § 200.414(c)(3).

47.     The policies, procedures, and general decision-making criteria justifying deviations apply prospectively.   Pursuant to 2 C.F.R. § 200.414(c)(4), "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved."   Moreover, "the Federal agency should incorporate

discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity." *Id.*

48.    Negotiated rates vary significantly from institution to institution. The primary reason for this variation is that different institutions conduct different types of research. Scientific laboratories tend to be far more expensive to build and maintain than generic office buildings. As such, an institution engaging in cutting-edge nuclear will likely have a higher indirect cost rate than an institution primarily engaged in social science research. Even in the context of scientific research, some types of research are more expensive than others. If a particular institution invests in an expensive piece of advanced lab equipment that supports multiple lines of research, that institution will have higher indirect cost rates than a different institution that does not use expensive lab equipment or uses such equipment for only one research project.

49.    Institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research. State of the art nuclear and energy research, for example, often requires higher indirect cost rates.

50.    Past studies show that indirect cost rates for university research are slightly less than those for other research performers, *i.e.*, that universities had the lowest percentage of total research costs classified as indirect costs as compared to federal laboratories and industrial laboratories.[3]

---

[3] Association of American Universities, *Frequently Asked Questions About Facilities And Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs.

**B. Prior Attempts to Limit Indirect Cost Rates.**

51.    In 2017, the Administration released a budget proposal that would have slashed the indirect cost rate for NIH grants to 10%. *See* Office of Management & Budget, Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018, at 43 (2017).

52.    The proposal spurred widespread criticism and alarm. The House Subcommittee on Labor, Health and Human Services, and Education of the Committee on Appropriations held a two-hour long hearing discussing concerns, on a bipartisan basis, relating to the proposed cap on indirect costs. Hearing on the Role of Facilities and Administrative Costs in Supporting NIH-Funded Research Before the Subcomm. on Labor, Health and Human Services, Education, and Related Agencies of the H. Comm. On Appropriations, 115th Con. (2017), available at: https://www.youtube.com/watch?v=R3Eb7CjsjRE.

53.    Congress then enacted, on a bipartisan basis, an appropriations rider providing that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. The appropriations rider also prohibits spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates," or to "intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.*

54.    Both the House and Senate Appropriations Committees specifically addressed the need for the rider in direct response to the Administration's proposal in their respective reports.

The House Report noted that, "[w]hile the Committee appreciates the Secretary's efforts to find efficiencies in NIH research spending, the Administration's proposal to dramatically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. No. 115-244, at 50 (2017). The Senate Report noted, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable across NIH grantees for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide. The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017).

55.    Congress not only adopted the rider in 2017; it has repeatedly reenacted the rider ever since. *See* Department of Health and Human Services Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84. And this rider remains in effect to this day, in the now-operative statute. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

56.    The appropriations riders were co-extensive with the proposed rate cap. To Plaintiffs' knowledge, no Administration has proposed a budget that would cap the indirect cost

rate for DOE grants at a fixed percentage, like 10 or 15%. Congress therefore has yet to adopt an analogous appropriations rider for DOE grants.

57.    In light of both the applicable regulations and the rider, the negotiated NIH indirect cost rates remained undisturbed until late on Friday, February 7, 2025, when NIH issued a Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates ("NIH Rate Change Notice"). NIH purported to slash and cap previously negotiated indirect cost rates on all existing and future grant awards for biomedical research, with an effective date of February 10, 2025.

58.    Given the dire consequences of the NIH Rate Change Notice, which would have dramatically disrupted the development of innovative medical research and treatment, three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in this case—filed complaints and motions for temporary restraining orders. All three plaintiff groups argued that the NIH Rate Change Notice was unlawful under the APA.

59.    The Court found that the serious consequences of the NIH Rate Change Notice warranted issuance of a nationwide temporary restraining order to maintain the status quo until the matter could be fully addressed by the Court. Following briefing, on March 5, 2025, the Court issued a nationwide preliminary injunction. *NIH*, 2025 WL 702163, at *1. After finding jurisdiction appropriate because the parties sought to vindicate rights rooted in federal statutes and regulations and sought relief that was injunctive in nature, the Court found the plaintiffs likely to succeed on the merits. *See id.* at *4–8. First, the Court found that the NIH Rate Change Notice violated applicable regulations, which barred deviation from negotiated rates without a documented justification, and more generally barred wholesale deviation from negotiated rates

in the fashion attempted by NIH. *See id.* at *10–11. The Court also found that plaintiffs were likely to succeed on their statutory claims that the NIH Rate Change Notice violated the appropriations rider and the APA. *See id.* at *11–16. In particular, the Court found that the NIH Rate Change Notice was arbitrary and capricious because the explanations provided for the rate change were "conclusory" and its "proffered 'reasons' fail[ed] to grapple with the relevant factors or pertinent aspects of the problem." *Id.* at *17–18. Furthermore, it found that the NIH Rate Change Notice failed to "recognize or consider the substantial reliance interests at issue." *Id.* at *19; *see id.* at *20 ("The Notice fails to contemplate the budgets of these institutions, formulated months and years before this Notice's sudden implementation. It fails to contemplate the risk to human life as research and clinical trials are suspended in response to the shortfall. It fails to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed."). The Court also found the plaintiffs were likely to succeed on their claims that NIH failed to follow notice-and-comment rulemaking procedures and enacted a policy that was impermissibly retroactive as to existing grants. *See id.* at *22–27. The Court then found that that the plaintiffs demonstrated irreparable harm and that the balance of the equities and public interest favored an injunction. *See id.* at *27–32. The Court enjoined the NIH Rate Change Notice on a nationwide basis. *See id.* at *35. The parties then jointly moved to convert the preliminary injunction to a permanent injunction. *See NIH*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), ECF No. 96. The government has not filed a motion to stay the injunction pending an appeal.

**C. DOE's Rate Cap Policy**

60.    On Friday, April 11, 2025, the DOE issued the Rate Cap Policy, titled "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)." The Rate Cap

Policy announces that the "hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs." The Rate Cap Policy provides that "[a]ll future Department grant awards to IHEs will default to this 15 percent indirect cost rate." The Rate Cap Policy further announces that, "[c]onsistent with [the Rate Cap Policy], the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy" (citing 2 C.F.R. § 200.340(a), (b)).

61.     The Rate Cap Policy justifies this sweeping change by stating that "[t]his system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people."  It also states the following as putative justification: "To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds."  It further states that indirect costs payments are "not for the Department's direct research funding" (citing 89 Fed. Reg. 30046-30093), while acknowledging that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards."

62.     The Rate Cap Policy purports to rely on the authority of 2 C.F.R. § 200.414(c)(1) for its setting of a single, uniform indirect cost rate of 15 percent for all institutions of higher education.  But that provision authorizes deviations from the negotiated indirect cost rates *only* for "either a class of Federal awards or a single Federal award" and "*only* when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with [2 C.F.R. § 414(c)(3)]." 2 C.F.R. § 200.414(c)(1) (emphasis added).  It does not authorize DOE to entirely eliminate the negotiated rate for all federal awards for institutions of higher

education.  Moreover, to deviate from a negotiated rate—absent a statutory or regulatory requirement to do so—DOE must comply with the requirement that the agency "implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3).  In addition, pursuant to the regulatory provision that immediately follows, DOE "must include" such "policies relating to indirect cost rate reimbursement" "in the notice of funding opportunity."  2 C.F.R. § 200.414(c)(4).

63.    The Rate Cap Policy is final agency action under the APA.  *See* 5 U.S.C. § 704. The Rate Cap Policy (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).  In particular, the Rate Cap Policy marks the consummation of DOE's decision-making process because it announces DOE's decision to immediately impose a 15% across-the-board indirect cost rate to institutions of higher education and to terminate grants that use a different rate.  And the Rate Cap Policy is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to limit the percent of indirect costs for which a grant recipient can be reimbursed under the grant.

**D. Plaintiffs' Prior Indirect Cost Funding and Plaintiffs' Injuries**

64.    Plaintiffs are attaching as exhibits to this Complaint declarations describing universities' DOE grants and the harms they face, which Plaintiffs incorporate here by reference.

**CLAIMS FOR RELIEF**

**Count I**

**Violation of Administrative Procedure Act—Contrary to Law**

**(Illegal Departure from Negotiated Cost Rates in Violation of 2 C.F.R. 200.414)**

65.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

66.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

67.     2 C.F.R. § 200.414(c)(1) states that negotiated indirect cost rates "must be accepted by all Federal agencies.  A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."

68.     In turn, 2 C.F.R. § 200.414(c)(3) states: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

69.     By pronouncing a single, uniform "policy" setting indirect cost rates for universities at 15% regardless of the otherwise applicable negotiated rate, DOE violated 2 C.F.R. § 200.414(c)(1) and (c)(3).

70.     These provisions authorize agencies to announce *procedures* governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate.  They do not authorize DOE to make a unilateral decision to wipe out all negotiated rates for all universities.  The plain text of 2 C.F.R. § 200.414(c)(3) requires agencies to enact three different

things—"policies, procedures, *and* general decision-making criteria," and then requires agencies to "follow" these tripartite requirements "to seek and justify deviations from negotiated rights."

71.    Here, while the Rate Cap Policy states that it "sets forth [DOE's] policies, procedures, and general decision-making criteria," the Rate Cap Policy establishes no "procedures."  A "procedure" is a "series of steps followed in a regular definite order." *Procedure*, M-W.com, https://www.merriam-webster.com/dictionary/procedure (last visited Apr. 14, 2025).  A categorical 15% dictate is not a procedure.  Nor does the Rate Cap Policy establish "general decision-making criteria."  Criteria are "standard[s] on which a judgment or decision may be based."  *Criterion*, M-W.com, https://www.merriam-webster.com/dictionary/criterion (last visited Apr. 14, 2025).  Again, a categorical 15% dictate is not "general . . . criteria."

72.    Moreover, the plain text of this provision states that DOE *will* follow those policies, procedures, and criteria *to seek and justify* deviations.  In other words: first the policies, procedures, and criteria will be enacted, and then DOE will use them to seek and justify deviations from the negotiated baseline.  DOE skipped the first step: it never enacted any policies, procedures, or criteria that it would subsequently rely upon to "seek" or "justify" changes to the baseline.  It just set rates at 15% for all universities.

73.    Reinforcing the point, Section 200.414(c)(3) authorizes "deviations" from negotiated rates.  A "deviation" is a "departure from a standard or norm."  *Deviation*, Dictionary.com, https://www.dictionary.com/browse/deviation (last visited Apr. 14, 2025).  And authority to provide for "deviations" does not empower DOE to eliminate the standard use of negotiated rates across broad swathes of institutions; rather, negotiated rates must remain the norm, with deviations just narrow exceptions. *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,

512 U.S. 218, 228–29 (1994) (holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (similar).

74.    The Rate Cap Policy also violates Section 200.414(f).  That provision states that recipients that do not have a negotiated indirect cost rate "may elect to charge a de minimis rate of up to 15 percent."   The provision then states that "[r]ecipients and subrecipients are not required to use the de minimis rate."  The Rate Cap Policy violates this provision by "setting a standardized 15 percent indirect cost rate for all grant awards to IHEs."  *Accord* 89 Fed. Reg. 30,046 (April 22, 2024) ("Other sections of the guidance adequately explain that recipients and subrecipients have a right to negotiate a rate, rather than using the de minimis rate.").

## Count II

## Violation of Administrative Procedure Act—Contrary to Law

## (Unlawful Termination of Existing Grants in Violation of 2 C.F.R. 200.340, 200.414(c), and Appendix III)

75.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

76.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

77.    Under 2 C.F.R. § 200.340(a), agencies may terminate grants on enumerated grounds: "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award," *id.* § 200.340(a)(1); "with the consent of the recipient," *id.* § 200.340(a)(2); or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," *id.* § 200.340(a)(4).

78.    Citing this regulation, the Rate Cap Policy states that DOE will "terminate all grant awards to IHEs that do not conform with" its 15% cap.

79.    None of the enumerated grounds, however, permit agencies to terminate grants on the ground that the agencies would prefer to use a different indirect cost rates.  In particular, while the regulation in some circumstances permits terminations "if an award no longer effectuates the program goals or agency priorities," the Rate Cap Policy does not conclude that any "award[s]" no longer effectuate DOE's priorities.  A desire to use a different indirect cost rate does not mean that the "award" no longer effectuates DOE priorities.

80.    Terminating existing grants based on the Rate Cap Policy would also violate 2 C.F.R. § 200.414(c)(4), which states: "The Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved under paragraph (e)."  The Federal Register notice promulgating this provision makes clear that any attempt to depart from negotiated rates must first be "established" and then "inclu[ded] . . . in the announcement of funding opportunity."  78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). Moreover, this provision underscores why Section 200.340(a) cannot provide the authority that the Rate Cap Policy claims: On the Rate Cap Policy's reading, this provision's limits would be meaningless.   Agencies  could  simply  terminate  existing  grants  and  thereby  evade  the requirements of Section 200.414(c)(4).

81.    Section C.7.a of Appendix III to Part 200, which provides rules for calculating indirect cost rates, confirms the unlawfulness of the Rate Cap Policy's termination directive. That provision states in relevant part: "Except as provided in paragraph (c)(1) of § 200.414, Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award.   Award levels for Federal awards may not be adjusted in future years as a

result of changes in negotiated rates." As this language reflects, the general rule is that the government-wide negotiated rate for a particular grantee that is in effect at the beginning of an award applies throughout the life of the award, even if that government-wide negotiated rate is renegotiated by a cognizant agency during the life of the award. The "except[ion]" is when a different rate from the government-wide negotiated rate is set via the procedures in § 200.414(c)(1). Moreover, under Section 200.414(c), a change to the policies, procedures, and criteria governing the justification for deviations—which is what the Rate Cap Policy purports to do—must occur when the grant is being negotiated, not in the middle of an existing grant. Section C.7.a does not authorize a change for awards that DOE has already approved and upon which a grantee has already relied. And Section 200.340(a)'s termination authority cannot be read to render a nullity the protections of Section C.7.a of Appendix III to Part 200.

### Count III

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Cost Recovery Regulations)

82.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

83.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

84.     Federal regulations and decades of Executive Branch practice establish substantive and procedural guidelines governing the recovery of indirect costs, which DOE's Rate Cap Policy blatantly violates.

85.     Substantively, the governing regulations dictate that grantees will recover the actual indirect costs that are reasonable and allocable to federal projects.

a. The bedrock principle is: "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402.

b. The regulations establish detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs. *See generally* 2 C.F.R. § 200.414; *accord* Appendix III.A ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity"); *id.* Appendix III.A.2.e.1 ("Indirect (F&A) costs are the broad categories of costs discussed in Section B.1.").

86.    By slashing indirect cost rates to 15%, DOE will prevent grantees from recovering their indirect costs.

87.    DOE's Rate Cap Policy does not even purport to adhere to the principle that grantees should recover their indirect costs. Instead, it assigns an arbitrary 15% indirect cost recovery rate across all universities simply because DOE has unilaterally decided that universities should be getting less money.

88.    Procedurally, federal regulations prescribe a complex process for negotiating an indirect cost recovery rate.

a. Institutions must document and submit costs in painstaking detail to support that process. Subpart E of part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards." 2 C.F.R. § 200.100(c). 2 C.F.R. § 200.414(e) stipulates that a set of appendices will set forth in detail "[r]equirements for development and submission of indirect cost

rate proposals and cost allocation plans." Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal"). For universities, Appendix III to Part 200 establishes the criteria for identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs). *Id.* § 200.414(e)(1). The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among multiple government projects.

b. Audits are the mechanism then used to determine what is charged to a federal award. 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it elects to have a program-specific audit. This audit is performed annually, and it must be conducted in accordance with articulated standards. *See* 2 C.F.R. §§ 200.504, 200.514. An auditor may identify any "questioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment:" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award;" (2) "[a]t the time of the audit, lacked adequate documentation to support compliance;" or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results of the audit and any questioned costs are factored into negotiation of indirect cost rates. *See* Appendix III to Part 200.

89.    DOE ignored that detailed process.  Instead, it arbitrarily determined that all universities would recover at a 15% rate, violating the regulations' substantive commands and rendering that entire regulatory process meaningless.

## Count IV

### Violation of the Administrative Procedure Act – Arbitrary and Capricious

90.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

91.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92.    The Rate Cap Policy is arbitrary and capricious for many reasons.

93.    DOE's justification consists of the following: "While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. See 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds."

94.    First, this justification is entirely conclusory and violates DOE's obligation "to examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'"  *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43).  DOE denigrates "indirect cost

payments" as "not for the Department's direct research funding." But DOE ignores that indirect costs are often necessary for DOE's own research to continue: Cutting-edge research, for example, requires physical infrastructure and equipment, ethics review boards, and many other costs that are not traceable to specific grants but are nonetheless essential for the work. DOE also ignores that indirect costs often differ from direct costs only in that they fund *multiple* research projects: For example, if an administrative employee supports three DOE grants, one NIH grant, and one private grant, their salary might be an indirect cost—but it would be essential for the work on DOE's grant, underscoring the irrationality of DOE's suggestion that indirect cost payments are less valuable than direct research funding. Then, DOE avers that it "must ensure it is putting [the American people's funds] to appropriate use on grant programs," without explaining why indirect costs are *not* an appropriate use. Next, DOE states that the Rate Cap Policy will "improve efficiency and curtail costs where appropriate," without explaining how slashing indirect funding will improve efficiency and ignoring that the Rate Cap Policy will cut funding across the board, not just "curtail[ing] costs *where appropriate*." Finally, DOE says that the Rate Cap Policy "seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds," without explaining why maintaining its decades-long approach to indirect costs is inconsistent with its obligation to responsibly manage federal funds.

95.     Second, the Rate Cap Policy is arbitrary and capricious because it reflects a new policy resting upon factual findings that contradict those which underlay the prior policy of OMB and DOE and that are also wrong. The prior policy rested on the view that a uniform indirect cost rate was not appropriate, and that negotiated rates should be both institution-specific and—

in most cases—substantially higher. The Rate Cap Policy provides no explanation for this reversal in course.

96.     Moreover, DOE ignores what Congress itself said about a nearly identical proposal to cap NIH indirect cost rates. According to the House of Representatives, "[t]he Administration's proposal to drastically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. No. 115-244, at 50 (2017). And according to the Senate, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable . . . for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide. The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017). What was true of biomedical research is just as true of the research funded by DOE. And while the appropriations rider was co-extensive with the specific proposal before it (cutting indirect cost rates for NIH grantees), DOE did not so much as consider the *reasons why* Congress concluded that a virtually identical proposed categorical cap would be devasting to research. Nor did those concerns merely lurk in the Congressional Record: Just a month before the Rate Cap Policy issued, the *NIH* court had described those concerns at length.

97.     Third, the Rate Cap Policy is arbitrary and capricious because it ignores obvious problems with its categorical 15% cap, including how that cap will thwart DOE's stated goals. The press release accompanying Rate Cap Policy says that it "aim[s] at . . . continuing to expand

American innovation and scientific research." But DOE ignores, again, that indirect costs are critical to supporting and maintaining world-class research. Nor does it consider that the across-the-board 15% rate amounts to a decision to fund only part of the costs of research DOE supports, and ultimately amounts simply to a decision to fund less research of particular types—including research that relies heavily on expensive overhead, as cutting-edge research often does. DOE does not explain how the Rate Cap Policy is consistent with its own stated goal of continuing to promote American innovation and cutting edge research.

98.    Fourth, Rate Cap Policy is arbitrary and capricious because DOE fails to explain why its own audits of indirect costs would not accomplish the task of "improv[ing] efficiency and curtail[ing] costs where appropriate." To the contrary, because audits look at specific costs, they can accomplish what DOE's blunderbuss policy cannot—identifying specific costs that can be appropriately curtailed.

99.    Fifth, the Rate Cap Policy is arbitrary and capricious because it ignores the reliance interests of the research institutions receiving federal funding and does not provide an explanation that accounts for those reliance interests. As the press release accompanying the Rate Cap Policy says, "the average rate of indirect costs incurred by grant recipients at colleges and universities is more than 30%." The Rate Cap Policy thus purports to slash indirect cost recovery by at least half—and often much more. With regard to existing grants, the reliance interests are obvious: budgets have already been determined and research benefitting from the funding has already started. But even with respect to new grants, universities have structured their budgetary affairs on the understanding that federal agencies will follow through by paying their legally required cost reimbursement using the longstanding practice of using negotiated indirect costs and rates. Universities have accordingly made costly decisions about long-term investments,

such as what physical infrastructure should be built, in reliance on negotiated rates with federal agencies allowing for the recovery of some such costs via depreciation, as well as the OMB regulations generally requiring agencies to use a negotiated indirect cost rate and permitting deviations from that rate only in narrowly limited circumstances.

100.    Sixth, the Rate Cap Policy is arbitrary and capricious because, without explanation, it imposes its new categorical 15% cap only on universities, and not other DOE grant recipients.  If (counterfactually) this categorical cap improved efficiency or reflected responsible stewardship of federal funds, DOE does not explain why it imposed that policy on only universities.  The press release accompanying the policy states that the average indirect cost rate for universities is "a significantly higher rate than other for profit, non-profit and state and local government grant awardees."  But DOE does not account for the possibility that universities' rates are higher because they engage in a larger proportion of cutting-edge research, which typically has higher indirect costs.  Nor does DOE say what average indirect cost rates are for "for profit, non-profit and state and local government grant awardees" or explain why, whatever those percentages are, those institutions should not be subject to the same 15% cap.

101.    Seventh, the Rate Cap Policy does not explain why the appropriate rate for all university recipients is 15%.  The governing regulations identify this amount as the "de minimis rate."  2 C.F.R. 200.414(f).  A "de minimis rate" does not fit every university recipient.

### Count V

### Violation of Administrative Procedure Act—Contrary to Law

### (Violation of Authorizing Statutes)

1.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

2.      The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

3.      DOE awards research grants pursuant to various statutes, and Congress has authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions.  Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.

4.      The Rate Cap Policy violates these statutes because it does not set a rate for "payment of reimbursable indirect costs" within the meaning of the statute.  It simply adopts an arbitrary 15% figure.

5.      As alleged above, moreover, the Rate Cap Policy is likely to have devastating effects across the country, not only on the research institutions themselves but also the many people who depend on the research that will be crippled by the Rate Cap Policy.  The Supreme Court has underscored that agencies may not enact sweeping rules of this sort without express congressional authorization.  In considering whether agency action is authorized by statute, courts consider whether the "history and breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion" counsel in favor of "hesitat[ing] before concluding that Congress meant to confer such authority."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).  Here, no Act of Congress expressly authorizes DOE to devastate research by enacting a radical change from institution-specific negotiated rates to a single across-the-board rate for all universities.  Thus, under the major questions doctrine, DOE cannot impose such a change unilaterally.

6.      Because Congress did not expressly authorize DOE to obliterate the cutting-edge research it has long funded, the Rate Cap Policy is invalid.

## Count VI

### Violation of Administrative Procedure Act—In Excess of Statutory Authority (Retroactivity)

102.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

103.    The APA directs courts to hold unlawful and set aside agency actions that are in excess of statutory authority.  5 U.S.C. § 706(2)(C).

104.    "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

105.    The Rate Cap Policy is a retroactive action because it "impair[s] rights a party possessed when [it] acted, increase[s] a party's liability for past conduct, [and] impose[s] new duties with respect to transactions already completed."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

106.    Congress did not authorize DOE to retroactively modify indirect cost rates when it enacted DOE's grantmaking authority, or in any other statute.  Nor can DOE evade this problem by purporting to apply the 15% cap only to new grants while terminating all existing grants with higher caps.  The reduced rate necessarily undermines project budgets that were previously approved and upsets institutions' commitments made in reliance upon those budgets.

107.    Because DOE's retroactive action is in excess of its statutory authority, the Rate Cap Notice is invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   Vacatur of the Rate Cap Policy;

b.   Declaratory judgment finding the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law;

c.   An injunction preliminarily and permanently prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form; from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB; and from terminating any grants pursuant to the Rate Cap Policy or based on a grantee's refusal to accept a indirect cost rate less than their negotiated rate;

d.   An order awarding Plaintiff's costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

e.   Any such further relief as the Court deems equitable, just, and proper.

Dated: April 14, 2025

Respectfully submitted,

JENNER & BLOCK LLP

CLEMENT & MURPHY, PLLC

By: /s/ Shoba Pillay

By: /s/ Paul D. Clement

Shoba Pillay, BBO No. 659739
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Paul D. Clement (*pro hac vice forthcoming*)
James Y. Xi (*pro hac vice forthcoming*)
Kyle R. Eiswald (*pro hac vice forthcoming*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com
*Attorneys for Association of American
Universities, Association of Public and Land-
grant Universities, and American Council on
Education*

Ishan K. Bhabha (*pro hac vice forthcoming*)
Lindsay C. Harrison (*pro hac vice forthcoming*)
Lauren J. Hartz (*pro hac vice forthcoming*)
Anjali Motgi (*pro hac vice forthcoming*)
Zachary C. Schauf (*pro hac vice forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
AMotgi@jenner.com
ZSchauf@jenner.com
*Attorneys for All Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ Shoba Pillay
Shoba Pillay, BBO No. 659739
Jenner & Block LLP
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com