# EXHIBIT 3

## **DECLARATION OF PETER MCDONOUGH**

I, Peter McDonough, declare as follows:

1. I am Vice President and General Counsel for the American Council on Education ("ACE"), having joined ACE in January 2015.

2. I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by ACE personnel and personnel from our member universities, and could testify thereto.

3. Founded in 1918, ACE is a membership organization composed of more than 1,600 colleges and universities, related associations, and other organizations in America and abroad. ACE is the only major higher education association to represent all types of U.S. accredited, degree-granting colleges and universities. Its members educate two out of every three students in all accredited, degree-granting U.S. institutions.

4. ACE's mission includes collaborating across the higher education sector to design solutions for today's challenges and shape effective public policy. A core reason for the organization's existence is to advocate for public policies that support its members' interests, including their interests in obtaining support for academic research.

5. ACE has members in all 50 states and the District of Columbia.

6. Among ACE's more than 1,600 member institutions are the University of Arizona, Boston University, Brandeis, Brown, Cal Tech, Colorado State, Cornell, Duke, the University of Illinois, MIT, the University of Michigan, Michigan State, the University of Nevada-Reno, Princeton, the University of Pennsylvania, the University of Rochester, Rutgers, the University of Utah, and the University of Wisconsin. I understand that some or all of these ACE members may be submitting declarations in this litigation, which provide institution-specific

detail on the matters described below.

7.  The federal government has selected ACE member colleges and universities to conduct a wide variety of vital research on behalf of United States citizens, funded in part by agency awards from across the federal government, including the Department of Energy ("DOE"). ACE member colleges and universities receive significant research funding from DOE grants. ACE member institutions rely on these funds to support research that targets some of the most difficult and pressing scientific problems related to energy, nuclear security, artificial intelligence, physics, climate, and many other fields. This research contributes to critical scientific discovery, improves lives, and adds immeasurably to our national security, welfare and economy.

8.  On April 11, 2025, DOE issued the guidance "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)" ("DOE Guidance"). The DOE guidance provides that indirect costs allowed on all future awards to institutions of higher education shall be limited to fifteen percent. Further, it provides that DOE "is undertaking action to terminate all grant awards to [institutions of higher education] that do not conform with this updated policy."

9.  If the DOE Guidance is permitted to remain in effect, it will irreparably harm research at ACE member institutions, Americans' interests in the outcomes of that research, and local economic activity. This research is important. It includes projects that further America's national security, advance defense technologies, support domestic industries, and promote energy independence. This research drives economic activity across the country and advances American competitiveness by improving energy solutions. The facilities, infrastructure and staff supporting this research that are paid for as indirect costs are essential to the continuation of this

research. The drastic decrease in indirect cost reimbursement announced in the DOE Guidance will immediately impair ACE members' ability to conduct research in compliance with the underlying award agreements and applicable laws, and it will create cascading and longer-term harms as well. This is not to mention the irreparable harm that *termination* of DOE grant awards to ACE member institutions would have.

10. Without continuing indirect cost reimbursement at ACE member institutions' negotiated rates, ACE member schools will no longer be able to carry out all their sponsored activities, including supporting the next generation of research scientists and properly maintaining facilities and equipment currently in use. At least some work will have to stop. ACE member institutions do not have sufficient budgeted operational funds to cover a sudden structural decrease in indirect cost recovery for a large number of existing awards on an ongoing basis. They will have to implement layoffs, both for researchers, staff scientists, post-doctoral trainees, research administration officers and other employees of the institutions who perform critical but indirect work in support of sponsored activity (such as custodians, security guards, and so forth); and implement reductions in administrative costs that are necessary for research services. Further, the DOE Guidance will have drastic implications for institutional capacity to enroll current and future doctoral students and support their progression to degree completion. This harm is not limited to monetary damages that can be rectified with a compensatory award. For example, even if the indirect cost rate was increased at a later date, if a research facility must be closed in the interim because there is no money to support its operation and maintenance, that harm cannot be undone.

11. ACE member institutions necessarily rely on both the direct cost and the indirect cost portions of funding provided with each specific DOE award in formulating

their overall operating budgets in any given year. Many ACE members have negotiated an indirect cost rate that is significantly higher than fifteen percent. Operating budgets rely upon estimates of direct and indirect sponsored funding to plan for annual staffing needs, infrastructure support (*e.g.*, IT networks, regulatory compliance, safety and grant management support), facility building and renovation, and equipment purchases to support a broad range of research activities

12. The declarations submitted by ACE members in this litigation will vividly illustrate the types of harms felt by all ACE members with DOE grant funding. It bears noting that ACE has many members receiving DOE grant funding and will be harmed if the DOE Guidance goes into effect that are not members of the Association of American Universities ("AAU") or the Association of Public and Land-Grant Universities ("APLU"). For example, Bucknell, Bowie State, BYU, Catholic University, DePaul, and Texas Christian fall into this category.

13. Moreover, the harmful impact of the DOE Guidance is not limited to colleges and universities. Many of ACE's members are the largest employers in their local areas. Where the lower indirect cost reimbursement rate requires layoffs, that loss of employment will be harmful not only to the affected employees and their families, but to the overall economic stability of the ACE member institutions' hometowns as a whole.

14. The DOE Guidance will make it economically unfeasible to carry out much of the sponsored activity that results in scientific breakthroughs that provide significant social and economic value to the country, sometimes opening up entirely new areas of commercial development. The United States is a stronger, more secure, and more economically vibrant country as a result of the collective benefits arising from federally

sponsored research. Additionally, the next generation of scientists, physicians, engineers, and other skilled workers develop their vitally important expertise while engaging in and learning from research they conduct at ACE member institutions. The DOE Guidance would drastically reduce the positive impact of this work and the pipeline of educated professionals that United States industry requires to be internationally competitive. Slowdowns or halts in research by ACE member colleges and universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening our nation's national security and its economic dominance

15. Temporary injunctive relief is vital to protect against these devastating consequences. Even if the DOE Guidance is ultimately rescinded or held invalid, nothing known to me or my colleagues at ACE suggests that our affected members will have the ability to cover such radical reductions in indirect cost reimbursement during the course of protracted litigation. Even ACE members with significant endowments do not have the ability simply to use those funds to make up these losses. For example, my long and deep experience regarding endowed funds informs my certainty that the vast majority of our members' endowed funds are restricted by the terms on which the funds were donated, and they cannot legally be redirected to cover research infrastructure costs. Moreover, an ACE member institution may only draw down the portion of the endowment that is unrestricted at a rate that complies with applicable law.

16. As non-profit institutions, ACE member institutions reinvest nearly all of their revenues into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, ACE member institutions do not generate significant surpluses that could be redirected without impacting core academic

priorities such as educational programs and financial aid support for students.

17. Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on ACE member institutions, which would in turn force reductions in key investments supporting ACE members' faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain ACE member institutions' academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 13, 2025

_____
Peter G. McDonough