# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*,

      *Plaintiffs*,

          v.

DEPARTMENT OF ENERGY *et al.*,

      *Defendants*.

Case No.  25-cv-10912

**(Leave to File Granted April 14, 2024)**

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................... iii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 6

    A.    Federal Grant Funding for Indirect Costs ........................................... 6

    B.    Plaintiffs and Member Universities' Federally Funded Research Programs ........................................................................................... 10

    C.    Prior Attempts to Limit Indirect Cost Rates Governing Federal Grants.............. 12

    D.    DOE's Rate Cap Policy................................................................... 14

LEGAL STANDARD ............................................................................................ 16

ARGUMENT ........................................................................................................ 16

I.    This Court Has Jurisdiction To Grant The Relief Requested......................... 16

II.    The Organizational Plaintiffs Have Standing. ............................................ 21

III.    Plaintiffs Have a Strong Likelihood of Success on Their Claims. ................. 23

    A.    The Rate Cap Policy Violates 2 C.F.R. § 200.414................................ 23

    B.    The Rate Cap Policy Violates The Requirements For Indirect Cost Recovery. ...................................................................................... 26

    C.    The Rate Cap Policy Violates Requirements For Grant Terminations............... 29

    D.    The Rate Cap Policy Is Arbitrary And Capricious. ........................... 30

    E.    The Rate Cap Policy Is Contrary To The Statutes Authorizing DOE To Make Grants.................................................................................. 36

    F.    The Guidance Is Impermissibly Retroactive. ..................................... 37

IV.    THE OTHER FACTORS FAVOR A TEMPORARY RESTRAINING ORDER. ........................................................................................................ 38

    A.    The Rate Cap Policy Is Poised To Inflict Irreparable Harm............................. 38

    B.    The Balance of the Equities and Public Interest Overwhelmingly Favor Relief............................................................................................. 44

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

CASES

*178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016)......................................................................................................... 16

*American Science & Engineering, Inc. v. Califano*, 571 F.2d 58 (1st Cir. 1978)...................... 17

*Atterbury v. United States Marshals Service*, 805 F.3d 398 (2d Cir. 2015) ........................ 17, 18

*B&B Trucking, Inc. v. USPS*, 406 F.3d 766 (6th Cir. 2005) ..................................................... 18

*Biden v. Nebraska*, 600 U.S. 477 (2023).................................................................................. 25

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)............................................. 37

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)................................................................*passim*

*Brimstone Railroad & Canal Co. v. United States*, 276 U.S. 104 (1928).................................. 37

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................ 45

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986) ........................................................................................... 21

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ..................... 42

*Corley v. United States*, 556 U.S. 303 (2009)........................................................................... 30

*Crowley Government Services, Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022)............... 17, 19, 20

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ............................................... 4, 32

*Department of Education v. California*, No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025)............................................................................................... 16, 17, 19, 20

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) .................................... 31, 34

*Doe ex rel. Doe v. Portland Public Schools*, 701 F. Supp. 3d 18 (D. Me. 2023) ....................... 38

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ........................................................................ 16

*Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022)................................... 17

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)................................................. 23, 32

*Hibbs v. Winn*, 542 U.S. 88 (2004) ........................................................................................ 30

*Housatonic River Initiative v. United States Environmental Protection Agency, New England Region*, 75 F.4th 248 (1st Cir. 2023)...................................................... 21, 22

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977)...................... 21

*International Union, United Automobile, Aerospace & Agriculture Implement Workers of America v. Brock*, 477 U.S. 274 (1986) ............................................ 23

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ................................................................. 30

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ............................................. 38

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................... 39

*Massachusetts v. National Institutes of Health (NIH)*, No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025)......................................................................................*passim*

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994) ................................................................................ 25

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ................................... 17, 18

*Michigan v. EPA*, 576 U.S. 743 (2015) ............................................................. 31

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ............................................ 4, 30-31, 34, 35

*National Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714 (Fed. Cir. 1988).................................................................................. 20

*National Council of Nonprofits v. Office of Management & Budget*, No. 25-cv-239, __ F. Supp. 3d __, 2025 WL 368852 (D.D.C. Feb. 3, 2025)................................... 39

*National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014)................................................................. 23

*New York v. Trump*, No. 25-CV-39, __ F. Supp. 3d __, 2025 WL 357368 (D.R.I. Jan. 31, 2025), *appeal docketed*, No. 25-1138 (1st Cir. Feb. 10, 2025)............................. 16

*Nken v. Holder*, 556 U.S. 418 (2009)............................................................... 44

*Normandy Apartments, Ltd. v. HUD*, 554 F.3d 1290 (10th Cir. 2009)................................ 18, 20

*North Star Alaska v. United States*, 14 F.3d 36 (9th Cir. 1994)..................................... 18

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ........................ 45

*Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981)...........................................................................................................15

*Plazzi v. FedEx Ground Package System, Inc.*, 52 F.4th 1 (1st Cir. 2022)...............................21

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)...........................................................................31

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).........................................................21-22

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................................23

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...................................................................5, 37

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)....................................39

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)....................................................39

## STATUTES

5 U.S.C. § 702..............................................................................................................16, 17

5 U.S.C. § 706(2)(A) ...................................................................................................23, 30

28 U.S.C. § 1331 ................................................................................................................17

41 U.S.C. § 4708 ..........................................................................................................4, 36

Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437 (*codified at* 41 U.S.C. § 4708)...................................................................................................................4, 36

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740..................................................................................................................................12

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, Title II, § 224, 138 Stat. 460, 677 ...........................................................................................13

## LEGISLATIVE MATERIALS

H.R. Rep. No. 115-244 (2017) .............................................................................................3

S. Rep. No. 115-150 (2017) ................................................................................................3

## OTHER AUTHORITIES

2 C.F.R. pt. 200, app. III ......................................................................................................7

2 C.F.R. § 200.1 ....................................................................................................9, 28, 34

2 C.F.R. § 200.340(a) ....................................................................................................15, 29, 30

2 C.F.R. § 200.340(a)(1) ............................................................................. 29

2 C.F.R. § 200.340(a)(2) ............................................................................. 29

2 C.F.R. § 200.340(a)(4) ............................................................................. 29

2 C.F.R. § 200.340(b) .................................................................................. 15

2 C.F.R. § 200.402 ................................................................................... 9, 27

2 C.F.R. § 200.414 ................................................................................. *passim*

2 C.F.R. § 200.414(a) ................................................................................... 7

2 C.F.R. § 200.414(c)(1) ........................................................................ *passim*

2 C.F.R. § 200.414(c)(3) ........................................................... 9, 10, 24, 25

2 C.F.R. § 200.414(c)(4) ........................................................ 10, 25, 26, 29

2 C.F.R. § 200.414(e) .................................................................................. 27

2 C.F.R. § 200.414(f) .................................................................................. 26

2 C.F.R. § 200.501 ..................................................................................... 7, 9

2 C.F.R. § 200.501(b) ...................................................................... 9, 28, 34

2 C.F.R. § 200.504 ........................................................................... 9, 28, 34

2 C.F.R. § 200.514 ........................................................................... 9, 28, 34

45 C.F.R. § 75.414 ..................................................................................... 14

78 Fed. Reg. 78,590 (Dec. 26, 2013) ...................................................... 26

89 Fed. Reg. 30,046 (Apr. 22, 2024) ................................................. 16, 26

Association of American Universities, *Frequently Asked Questions About
  Facilities And Administrative (F&A) Costs of Federally Sponsored University
  Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-
  questions-about-facilities-and-administrative-costs ....................................... 15

*Criterion*, *Merriam-Webster.com*, https://www.merriam-webster.com/diction
  ary/criterion (last visited Apr. 14, 2025) ................................................ 24

*Deviation*, *Dictionary.com*, https://www.dictionary.com/browse/deviation (last
  visited Apr. 14, 2025) ............................................................................... 25

DOE, *Policy Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education* (Apr. 11, 2025) ................................................................. 2

NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/ guide/notice-files/NOT-OD-25-068.html .......................................................... 13

*Procedure*, *Merriam-Webster.com*, https://www.merriam-webster.com/diction ary/procedure (last visited Apr. 14, 2025) ........................................................ 24

## INTRODUCTION

This suit challenges a flagrantly unlawful action by the federal government—the second of its type in two months—that, if permitted to stand, will immediately devastate research at America's universities and degrade the United States' competitiveness on the world stage. Issued by the Department of Energy ("DOE") at around 5 pm on Friday night, this policy repeats the effort of the National Institutes of Health ("NIH") to dramatically upend how university research is funded. The first such effort was quickly enjoined by this Court, and this copycat effort should suffer the same fate.

The United States' world-leading position in science reflects in large part how it has funded research for the last six decades. It funds all costs of the research it supports, via mechanisms that ensure stability and protect reliance interests. Some of those costs are "direct"; that is, they are readily attributable to specific projects. Others are "indirect"; that is, they are necessary for the research to occur but shared between multiple projects, like facilities necessary to store hazardous nuclear isotopes used in a range of grants. Universities negotiate an institution-wide "indirect cost rate" with one agency (usually the Department of Health and Human Services, or "HHS"). Then by regulation, these "[n]egotiated indirect cost rates must be accepted by all Federal agencies," unless Congress has provided otherwise or a narrow exception applies. 2 C.F.R. § 200.414(c)(1). Under this narrow exception, other agencies may promulgate "policies, procedures and general decision-making criteria" that they "will follow to seek and justify deviations" and thereby arrive at a different, individualized rates that accomplish the goal that indirect cost rates have pursued for 60 years—allowing institutions to cover the costs of conducting federally supported research.

At the close of business on Friday, April 11, DOE issued a policy modeled on the NIH policy that Congress rejected and this Court enjoined. That policy upends the approach that has supported American research for decades and defies the text of the regulation that embeds that settled approach

1

in law—all based on no real explanation whatsoever, much less one that would account for the grievous harms DOE's new policy will inflict. DOE has simply declared that it is "setting a standardized 15 percent indirect cost rate for all grant awards to" all universities and that it is "undertaking to terminate all grant awards to [universities] that do not conform with this updated policy." DOE, *Policy Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education* (IHE) (Apr. 11, 2025) (Compl. Ex. 1) ("Rate Cap Policy"). Given that the pre-existing rates were tailored to specific institutions based on a well-established negotiation process, their replacement with a one-size-fits-all flat rate is the very definition of arbitrariness. It does not seem to matter to DOE that this arbitrary cap will not support the research that DOE has agreed to fund. Nor does it seem to matter how well-justified are the higher negotiated rates, including because higher rates are essential to doing science, especially the most advanced science. And although the Rate Cap Policy invokes "efficiency" and the need to "curtail costs where appropriate," DOE has applied this new policy only to universities and has done so regardless of the appropriateness of their costs.

Last month, a district court permanently enjoined a similar policy announced by NIH as inconsistent with the governing regulations and as arbitrary and capricious—as well as contrary to an appropriations rider Congress enacted in response to the only earlier effort by an administration to impose an arbitrary cap on indirect cost rates. *Massachusetts v. Nat'l Insts. of Health (NIH)*, No. 25-CV-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), *judgment entered* (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (D. Mass. Apr. 9, 2025). When Congress enacted that rider, which was co-extensive with the proposed cap, it observed that such an arbitrary cap would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965" and emphasized that it had "not seen any details of the proposal that might explain how it could be accomplished without throwing

research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017). Such a cap, Congress concluded, was "misguided and would have a devastating impact on … research across the country." H.R. Rep. No. 115-244, at 50 (2017). While Congress's appropriations rider was co-extensive with the NIH-focused proposal that was floated in 2017, there is no basis to believe that Congress would not have responded to a broader proposal with a broader rider. Nor is there any reason to think that last month's NIH cap would have escaped judicial invalidation if it had included DOE grants. DOE's similar policy is patently unlawful for nearly all the other reasons that independently supported the permanent injunction in *NIH*.

To begin, the Rate Cap Policy violates the indirect cost regulations that OMB promulgated precisely to provide stability, protect reliance interests, and ensure that recipients can cover the *actual costs* of conducting the research that the government has asked them to undertake. Those regulations provide, in no uncertain terms, that once rates are carefully negotiated on an institution-specific basis (typically by HHS), the "[n]egotiated indirect cost rates must be accepted by all Federal agencies." 2 C.F.R. § 200.414(c)(1). DOE's reading of that mandate's narrow exceptions would render that command meaningless and effectively replace the word "must" with "may," allowing any agency to jettison those negotiated rates simply by *announcing* a different across-the-board policy. But of course, nothing in the regulation's text supports that bizarre reading or justifies favoring one-size-fits-all policies over tailored institution-specific rates. Indeed, the Rate Cap Policy separately violates the regulations' requirement that any departure from the negotiated rate appear upfront in the notice of funding opportunity—a requirement that DOE cannot evade by purporting to cancel the grants of recipients who decline to agree to its unlawful 15% rates.

The Rate Cap Policy also makes no genuine attempt to comply with the reasoned-decisionmaking requirements of the Administrative Procedure Act ("APA"). Although the Rate Cap

3

Policy strings together a few sentences describing its change, absent is any genuine attempt at an *explanation*—one that would "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Rate Cap Policy ignores that indirect costs are necessary for critical research to proceed and are distinguished from direct costs only in that they are not attributable to *just one* grant. It ignores the devastating effects of jettisoning an approach dating back to 1965—effects that Congress itself identified just a few years before, including thwarting the very goal that the Rate Cap Policy purports to pursue: "continuing to expand American innovation and scientific research." The Rate Cap Policy, as well, ignores the reliance interests of the research institutions receiving federal funding—reliance interests that DOE casually destroys. Finally, the Rate Change Policy inexplicably imposes its new requirement only on universities. If this approach was a sound policy necessary to protect the public fisc (it is not), DOE would have applied it across the board to all DOE grantees—or at least explained why it targeted only universities. The contours of DOE's decision thus "cannot be adequately explained in terms of" the explanation it provided; it is "more of a distraction." *Dep't of Com.*, 588 U.S. at 783-85.

Nor, finally, does DOE have statutory authority to create its arbitrary 15% rate. Congress since 1962 has authorized agencies to use "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437 (*codified at* 41 U.S.C. § 4708). But the Rate Cap Policy does not even attempt to measure "reimbursable indirect costs"; it conjures a number out of thin air and attempts to impose that figure by fiat to displace rates that were negotiated on an institution-specific basis in conformity with longstanding law. Moreover, when agencies seek to enact

4

sweeping and unprecedented rules that one would expect to emanate (if at all) from the legislative branch, courts scrutinize—and scrutinize some more—whether Congress actually conferred the broad authority the agency claims, analyzing the "history and breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion," while "hesitat[ing] before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000), *superseded by statute as stated in FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898 (2025)). Here, that scrutiny only confirms what is already obvious: Congress never authorized DOE to wreak the havoc that the Rate Cap Policy is poised to inflict on America's scientific dominance.    To the contrary, the one prior time Congress confronted such an executive proposal, it squarely rejected it in favor of a continued institution-specific approach. That fully accords with the separation of powers, as institution-specific negotiations are a classic example of executing the law, while an across-the-board 15% cap is legislative in nature.

Make no mistake: The effects of DOE's unlawful actions will be immediate and devastating. The Rate Cap Policy states unequivocally that "the Department *is undertaking* action to terminate all grant awards to IHEs that do not conform with this updated policy." Compl. Ex. 1 (emphasis added). That is, DOE is putting recipients to a choice: Either accept reductions in indirect cost rates, or face terminations. And as soon as recipients face that choice, the harm will be immediate and irreparable. Because universities cannot sustain DOE-funded programs at the 15% indirect cost rate that DOE will now impose, myriad critical projects—often the product of years or decades of effort—are in jeopardy of being stopped in their tracks. These include the development of advanced nuclear and cybersecurity technologies, arms control verification mechanisms designed to reduce the risk of nuclear war, novel radioactive drugs to diagnose and treat cancer, and upgrades for the electrical grids that keep the lights

on in rural communities, among many others. Meanwhile, the human cost will be immense, as universities will have to immediately reduce staff and training programs—irreversibly damaging their academic communities, the careers of young researchers, and the national interest in training the next generation of scientists. Nor can the consequences of grinding vital scientific work to a halt, and stifling training, be unwound. The pace of scientific discoveries in the national interest will be slowed. Progress on novel energy sources, a safe and effective nuclear deterrent, and cures for debilitating and life-threatening illness will be obstructed. America's rivals will celebrate, even as science and industry in the United States suffer. A temporary restraining order should issue to avoid these imminent harms.

## STATEMENT OF FACTS

### A.  Federal Grant Funding for Indirect Costs

For decades, DOE-funded research at universities has made the United States a world leader in basic science. DOE grants have funded scientific research that has led to innumerable scientific breakthroughs and innovations across scientific disciplines. *See, e.g.*, MIT Decl. ¶ 7; Caltech Decl. ¶ 4.[1] Most DOE-funded research occurs at outside institutions, including universities. This approach allows DOE to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.

Universities and other recipients generally do not receive lump-sum grants from DOE. Instead, they use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research. DOE grants typically allow the recovery of two types of costs. The first is "direct costs"—costs that can be attributed to a specific research project. Those might include, for example, the salary for a graduate student dedicated to

_____

[1] Citations to declarations herein are to the exhibits submitted with Plaintiffs' Complaint.

working on a particular project.  The second category is "indirect costs"—costs that are necessary for research but that cannot be attributed to any one specific research project.

"[I]ndirect . . . costs" have two components: "[f]acilities" and "[a]dministration."  2 C.F.R. § 200.414(a).  The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses."  *Id.*  This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of laboratories.  Those costs are indirect because a single building might house numerous research groups engaged in multiple distinct projects.

The "[a]dministration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'"  2 C.F.R. § 200.414(a).  This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as human and animal research review boards, financial reporting and purchasing, training and education, and managing potential conflicts of interest.  Such costs are indirect because a single group of employees may handle them for multiple projects.  Together, these indirect cost categories, or "F&A costs," pay for critical research infrastructure, without which the funded research projects could not proceed.

The computation and determination of indirect costs are subject to extensive regulation—and then fixed for a specified period of time in recognition of the institutions' needs for predictability and planning.  *See* 2 C.F.R. pt. 200, app. III (Indirect (F & A) Costs Identification and Assignment, and Rate Determination For Institutions of Higher Education (IHEs)) ("Appendix III to Part 200"); *see also* 2 C.F.R. §§ 200.414, 200.501.  Research institutions must express their indirect costs as a rate

that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs to yield reimbursement for the actual cost of the research. *See* Appendix III to Part 200. This methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs. As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs. Suppose, too, that the laboratory's sole indirect cost is the cost of electricity, which costs $10,000 per year. Because the cost of electricity ($10,000) is 10% of the total overheard-bearing direct costs ($100,000), the indirect cost rate would be 10%. Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 of electricity costs would be allocated to the second project.

Federal regulations prescribe a detailed methodology for negotiating indirect cost rates. *See* Appendix III to Part 200. Typically, a single agency negotiates an indirect cost rate with an institution. 2 C.F.R. § 200.414. For universities, rates are generally negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." Appendix III(C)(11)(a)(1) to Part 200. That indirect cost rate then applies to all of that institution's grants across the entire federal government.

Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs. For example, if an institution seeks to recover the cost of building maintenance, it must document those costs and then allocate those maintenance costs across

8

research and non-research programs.  The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate.  Again, this rate reflects actual, verified costs incurred by the institution.  And by regulation, the rate must reflect actual direct and indirect costs. "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs less any applicable credits."  2 C.F.R. § 200.402.  The regulations then establish detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs.  *See generally* 2 C.F.R. § 200.414; Appendix III to Part 200; *accord* Appendix III(A) to Part 200 ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity"); *id.* (A)(2)(e)(1) ("Indirect (F&A) costs are the broad categories of costs discussed in Section B.1.").

Once the federal agency agrees to an indirect cost rate, it binds the entire federal government for a specified period—typically one year, but sometimes up to four.  *See* Appendix III to Part 200; *see also* 2 C.F.R. §§ 200.414, 200.501.  After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred. 2 C.F.R. §§ 200.1, 200.501(b), 200.504, 200.514.  The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.  *See* Appendix III to Part 200.

The "[n]egotiated indirect cost rates must be accepted by all Federal agencies," including DOE.  2 C.F.R. § 200.414(c)(1). The only exception is if a "deviation[]" from these rates "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation" or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]."  2 C.F.R. § 200.414(c)(1), (3).  A deviation from a negotiated indirect cost rate, pursuant to 2 C.F.R. § 200.414(c)(3), requires that "[t]he Federal agency must implement, and make publicly available,

9

the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3). Any such deviation can only apply prospectively. Pursuant to 2 C.F.R. § 200.414(c)(4), "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved." Moreover, "the Federal agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity." *Id.*

Negotiated rates differ significantly among universities primarily because different institutions conduct different kinds of research. There is simply no one-size-fits-all rate. Certain facilities, like specialized laboratories, are more expensive than others. Schools that engage in high-energy physics research, for example, are likely to have higher rates than those doing social science. Even in the context of scientific research, some types of research are more expensive than others. If a particular institution invests in an expensive piece of advanced lab equipment that supports multiple lines of research, that institution will have higher indirect cost rates than a different institution that does not use expensive lab equipment or uses such equipment for only one research project.

### B. Plaintiffs and Member Universities' Federally Funded Research Programs

As set forth more fully in its contemporaneously filed complaint, Plaintiffs are several associations of universities and individual universities—the Association of American Universities ("AAU"), the Association of Public and Land-Grant Universities ("APLU"), the American Council on Education ("ACE," and collectively, the "Organizational Plaintiffs"),

AAU is an association composed of 69 leading research universities with the goal of transforming lives through education, research, and innovation. AAU Decl. ¶ 3. Plaintiffs' member universities receive significant research funding from DOE grants. *See, e.g.*, AAU Decl. ¶ 13; Brown Decl. ¶ 4; Caltech Decl. ¶ 3; Cornell Decl. ¶ 4; MSU Decl. ¶ 3. AAU's members alone account for

about two-thirds of DOE's total R&D expenditures. AAU Decl. ¶ 4. Many of Plaintiffs' member universities have negotiated an indirect cost rate that is significantly higher than 15%, often in the 50-60% range. *See, e.g.*, AAU Decl. ¶¶ 11, 13(a)-(b); APLU Decl. ¶¶ 15-17; Brown Decl. ¶ 7; Caltech Decl. ¶ 3; Illinois Decl. ¶ 12; Michigan Decl. ¶ 11; MSU Decl. ¶ 10. These negotiated rates have already been relied upon by Plaintiffs' members in budgeting for their DOE-funded research programs. *See, e.g.*, AAU Decl. ¶ 11; APLU Decl. ¶ 13; Brown Decl. ¶ 7; BU Decl. ¶ 15; Caltech Decl. ¶ 16; Cornell Decl. ¶ 20; Illinois Decl. ¶ 15; MSU Decl. ¶ 15.

APLU is a membership organization that seeks to "foster[] a community of university leaders collectively working to advance the mission of public research universities," including "more than 230 public research universities, land-grant institutions, state university systems, and affiliated organizations spanning across all 50 U.S. states, the District of Columbia, and six U.S. territories." APLU Decl. ¶ 3. APLU member institutions conduct "a wide variety of vital research on behalf of American citizens," including based on grant funding from DOE, with $1.9 billion in DOE grant funding in fiscal year 2022. APLU Decl. ¶ 5.

ACE is a membership organization composed of more than 1,600 colleges and universities, related associations, and other organizations in America and around the world. ACE Decl. ¶ 3. Its members "conduct a wide variety of vital research on behalf of United States citizens, funded in part by agency awards from across the federal government, including the Department of Energy." ACE Decl. ¶ 7. Those DOE awards support research that targets some of the most difficult and pressing scientific problems related to energy, nuclear security, artificial intelligence, physics, climate, and many other fields. *Id.*

Plaintiffs Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University

of Michigan, Board of Trustees of Michigan State University, Trustees of Princeton University, and University of Rochester are research universities that house significant scientific study and innovation supported by DOE grants. They collectively receive hundreds of millions of dollars to support thousands of projects. *See, e.g.*, Brown Decl. ¶ 7; Caltech Decl. ¶ 3; Cornell Decl. ¶ 15; Illinois Decl. ¶ 12; MIT Decl. ¶ 9; Michigan Decl. ¶ 12; MSU Decl. ¶ 3; Rochester Decl. ¶ 9.

### C. Prior Attempts to Limit Indirect Cost Rates Governing Federal Grants.

The DOE's recent action is not the first attempt to override institution-specific negotiated rates with a sudden, sweeping, and one-size-fits-all approach. In 2017, the Executive Branch proposed slashing the indirect cost rate to 10% across the board for all NIH grants. The proposal caused widespread criticism and alarm: Congress saw immediately that the proposal would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965"; noted that Congress had "not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray," S. Rep. 115-150, at 109; and concluded that this proposal was "misguided and would have a devastating impact on biomedical research across the country," H.R. Rep. 115-244, at 50. To avert disaster, Congress enacted an appropriations rider providing that regulatory "provisions relat[ed] to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017," and specifying that no appropriated funds "made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. Congress has repeatedly reenacted the rider ever since, and it remains in effect to

this day in the now-operative statute.  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

In February 2025, the Administration tried the same tactic again when NIH issued a notice stating that it was "imposing a standard indirect cost rate on all grants of 15%."  NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* ("NIH Rate Change Notice"), NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html.  NIH purported to slash and cap previously negotiated indirect cost rates on all existing and future grant awards for biomedical research, with an effective date of February 10, 2025.  Given the dire consequences of the NIH Rate Change Notice, three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in this case—filed complaints and motions for temporary restraining orders to enjoin the policy.  *See NIH*, 2025 WL 702163, at *1.  All three plaintiff groups argued that the NIH Rate Change Notice was unlawful pursuant to the APA.  *Id.* at *3.

A federal district court quickly enjoined that policy, issuing first a nationwide temporary restraining order to maintain the status quo and then, following briefing, issuing a nationwide preliminary injunction.  *See id.* at *1.  The court first rejected the government's argument that the case belonged in the Court of Federal Claims under the Tucker Act as a breach-of-contract action, determining that the parties sought to vindicate rights rooted in federal statutes and regulations and sought relief that was prospective and injunctive in nature.  *Id.* at *4-8; *see id.* at *6 (determining the "gravamen of Plaintiffs' Complaints does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress and NIH"); *id.* at *7 ("Plaintiffs do not bring claims for past pecuniary harms.  Rather, like the petitioners in *Bowen*, their claims are to preserve their ongoing and prospective agreements with NIH.").

13

The court then found that the plaintiffs were likely to succeed on the merits.  First, the court concluded that the NIH Rate Change Notice violated the regulatory requirements for indirect costs under 45 C.F.R. § 75.414—the HHS counterpart to 2 C.F.R. § 200.414—which bars deviation from the negotiated rates without a documented justification and more generally bars across-the-board deviation in the manner attempted by NIH.  *Id.* at *10-11.  The court also found that the plaintiffs were likely to succeed on their statutory claims that the NIH Rate Change Notice violated the appropriations rider and the APA.  *Id.* at *11-16.  In particular, the court found that the NIH Rate Change Notice was arbitrary and capricious because the explanations provided for the rate change were "conclusory" and its "proffered 'reasons' fail[ed] to grapple with the relevant factors or pertinent aspects of the problem." *Id.* at *17-18.  Further, the court found that the policy failed to "recognize or consider the substantial reliance interests at issue." *Id.* at *19; *see id.* at *20 ("The Notice fails to contemplate the budgets of these institutions, formulated months and years before this Notice's sudden implementation. . . .  It fails to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed.").  The Court also found the plaintiffs were likely to succeed on their claims that NIH failed to follow notice-and-comment rulemaking procedures and enacted a policy that was impermissibly retroactive as to existing grants.  *Id.* at *26-27.  On the remaining preliminary injunction factors, the court concluded that the plaintiffs demonstrated irreparable harm and that the balance of the equities and public interest favored an injunction.  *Id.* at *28-32.

### D.  DOE's Rate Cap Policy.

Now the Administration attempts the same maneuver with DOE, issuing late on Friday April, 11, 2025 the Rate Cap Policy, entitled "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)."  Compl. Ex. 1.  The Rate Cap Policy announces that the "Department

14

will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15% indirect cost rate for all grant awards to IHEs." *Id.* The Policy provides that "[a]ll future Department grant awards to IHEs will default to this 15 percent indirect cost rate." *Id.* The Policy applies this supposedly necessary limit on indirect cost rates "only with respect to" universities. *Id.* This rate is lower than that applicable to other types of recipients, who, based on past studies, actually have higher indirect cost rates than institutions of higher education, yet the Rate Cap Policy makes no account for disadvantaging universities in this respect. *See* Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs.

The Rate Cap Policy further announces that, "[c]onsistent with [the Rate Cap Policy], the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy." Compl. Ex. 1 (citing 2 C.F.R. § 200.340(a), (b)). The Rate Cap Policy appears to contemplate terminations beginning immediately, stating that "hereinafter, the Department will no longer use the negotiate indirect cost rate[s]" and "is undertaking action to terminate all grant awards . . . that do not conform. . . ." *Id.*

The Rate Cap Policy purports to justify this abrupt and sweeping change by stating that "[t]his system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." *Id.* ("To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds."). While recognizing that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant

15

awards," it avers without further explanation that indirect cost payments are "not for the Department's direct research funding." *Id.* (citing 89 Fed. Reg. 30,046-93 (Apr. 22, 2024)).

## LEGAL STANDARD

The burden of proof for a temporary restraining order is the same as that for a preliminary injunction under Federal Rule of Civil Procedure 65. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The moving parties must show that the weight of the following factors favors granting preliminary relief: "[1] likelihood of success on the merits; [2] potential for irreparable injury, [3] balance of the relevant equities; and [4] effect on the public interest if the Court grants or denies the TRO." *New York v. Trump*, No. 25-CV-39, __ F. Supp. 3d __, 2025 WL 357368, at *1 (D.R.I. Jan. 31, 2025) (citing *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981)), *appeal docketed*, No. 25-1138 (1st Cir. Feb. 10, 2025). When defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

**I.     This Court Has Jurisdiction To Grant The Relief Requested.**

This Court has subject matter jurisdiction and authority to grant the relief requested under 5 U.S.C. § 702. *See NIH*, 2025 WL 702163, at *4. Just as NIH did, DOE is likely to argue that this suit must be brought in the Court of Federal Claims under the Tucker Act. And just as the Court rejected this argument when brought by NIH, it should reject it here too. The Supreme Court's recent decision in *Department of Education v. California*, No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025) (per curiam), does not undermine the Court's reasoning in *NIH*. To the contrary, it reinforces the Court's conclusion that the government cannot avoid an APA case merely by claiming that the case relates to a contract or grant.

16

District courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This case arises under a federal law: the APA. And as the Supreme Court noted in *California*, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" or "to claims seeking 'money damages.'" 2025 WL 1008354, at *1 (quoting 5 U.S.C. § 702). Here, however, no statute "expressly or impliedly forbids the relief which is sought," and Plaintiffs do not seek "money damages." Plaintiffs' claims belong in Article III courts.

Under decades of precedent that the district court followed in *Massachusetts v. NIH*, the Tucker Act divests courts of APA jurisdiction only when the plaintiff's claim is "essentially a contract dispute," *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978), and is "*at its essence* a contract claim," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (emphasis added). That implied exception is narrow; courts routinely reject the "'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 967); *see Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1298 (Fed. Cir. 2022); *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 407-08 (2d Cir. 2015). The Supreme Court's recent *California* decision reinforced that precedent, emphasizing that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 2025 WL 1008354, at *1 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). A broader approach would improperly "deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 967-68. And the existence of a contract in the background does not insulate the government from challenges to illegal agency action. *See, e.g., Crowley*, 38 F.4th at 1102 (APA

17

claim challenging agency's authority belonged in district court because plaintiff "d[id] not seek to enforce or recover on [a] contract" and did not "seek monetary relief").[2]

In assessing whether the Tucker Act impliedly precludes jurisdiction, courts consider "both . . . the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968; *NIH*, 2025 WL 702163, at *4-6 (applying this test). Both factors favor this Court's jurisdiction.

*First*, Plaintiffs root their claims in federal statutes and regulations, not contract terms. They claim DOE's actions violate the statutes and regulations governing DOE grants and the APA. Plaintiffs do not base their claims on the terms of any contract. Indeed, Plaintiffs contend that the Rate Change Notice is illegal as applied to *all* DOE grants to universities, including future grants for which no contract exists. The "source of the rights" here, *Megapulse*, 672 F.2d at 968, is not contractual. These cases instead challenge agency overreach—the heartland of the APA. *See Bowen v. Massachusetts*, 487 U.S. 879, 904-05 (1988); *NIH*, 2025 WL 702163, at *6 ("While it is true that the Notice of Award operates as a contract, the claims in this case turn on how the regulations govern the provision of these awards. This is further underscored by the Rate Change Notice's impact not just on current grants, but future ones as well.").

*Second*, "the type of relief sought (or appropriate)" differs from the relief available from a Tucker Act claim. *Megapulse*, 672 F.2d at 968. Plaintiffs seek neither a money judgment nor an injunction directing the government to pay money. Instead, they seek declaratory and injunctive relief

---

[2] Circuits nationwide have followed *Megapulse*'s test for determining whether the Tucker Act impliedly precludes district court jurisdiction. *See Atterbury*, 805 F.3d at 408; *Normandy Apartments, Ltd. v. HUD*, 554 F.3d 1290, 1300 (10th Cir. 2009); *B&B Trucking, Inc. v. USPS*, 406 F.3d 766, 768 (6th Cir. 2005); *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994).

returning the parties to the status quo by requiring the government to respect negotiated rates for indirect costs. The Supreme Court has made clear that this type of suit may proceed in district court, because it "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory [and regulatory] mandate itself." *Bowen*, 487 U.S. at 900. The fact that an injunction may later cause the government to honor its obligation to make payments does not strip this Court of jurisdiction. *See Crowley*, 38 F.4th at 1108 ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief." (quotation omitted)).

Nothing in *California* suggests otherwise. *California* presented an unusual case where the plaintiffs dressed up a pure breach of contract case seeking money damages as an APA claim. In *California*, the government terminated the plaintiffs' contracts because those contracts no longer reflected the government's priorities. The district court granted a TRO directing the government to continue paying the plaintiffs money under the contracts while the case progressed. The Supreme Court vacated the TRO, reasoning that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." 2025 WL 1008354, at *1 (citation omitted).

This case is nothing like *California*. In *California*, the challenged agency action was the breach of contract itself, and the desired remedy was an order forcing the government to continue paying money under the contract. Here, by contrast, the challenged agency action is DOE's decision to ignore binding regulations and impose a 15% indirect cost rate for all grants to IHEs, present and future—an agency policy, not a mere breach of contract. Indeed, to adjudicate Plaintiffs' claims, the Court need not examine the terms and conditions of any grant—a telltale sign that this is not a breach of contract

case in disguise.  Instead, it must evaluate DOE's extra-contractual action announcing an agencywide policy to reset the negotiated indirect cost rates for IHEs in violation of applicable regulations and statutes.  And unlike in *California*, Plaintiffs are not seeking a court order directing the government to continue paying money under a contract.  Instead, they are seeking prospective equitable belief because DOE has violated and is continuing to violate statutory and regulatory provisions.  Although a ruling in Plaintiffs' favor may ultimately lead Plaintiffs to recover indirect costs at rates higher than 15%, *California* was careful to underscore that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 2025 WL 1008354, at *1  (quoting *Bowen*, 487 U.S. at 910).

Indeed, this case is closely analogous to *Bowen*, which *California* did not disturb.  In *Bowen*, the Court held that plaintiffs could proceed in district court under the APA to obtain prospective equitable relief for harms arising from the "administration of Federal grant-in-aid programs." *Bowen*, 487 U.S. at 898.  Here, as in *Bowen*, plaintiffs do not seek "money damages" or an order for payment of money; rather, they seek the quintessential APA remedy of vacatur, as well as declaratory and injunctive relief prohibiting DOE from relying on the Rate Cap Policy and requiring it to apply negotiated cost rates in accordance with its regulations.  That is nothing like an injunction to pay a specific sum. *See Crowley*, 38 F.4th at 1110-12; *Normandy Apartments*, 554 F.3d at 1296-97.

Finally, "the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court." *Bowen*, 487 U.S. at 901.  The Court of Federal Claims could not set aside or enjoin unlawful agency action. *See Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1988) (explaining "there is no provision" of the Tucker Act "giving the Court of Federal Claims jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief before the court").  And it could not reset negotiated rates for *future* grants either.

And even leaving aside the practical impossibility of hundreds of universities filing thousands of Tucker Act suits in the Court of Federal Claims, those suits could not even begin to remedy the unlawful choice that DOE is poised to force upon Plaintiffs *right now*:  Accept a 15% indirect cost rate across the board, or find your grants terminated.  As explained below, Plaintiffs *cannot* sustain their pathbreaking research at that 15% rate, and the effect of this unlawful ultimatum will simply be to halt countless critical scientific research projects.  The APA exists precisely to provide "prospective relief" aimed to put on lawful footing the "rather complex ongoing relationship between the parties" that exists here.  *Bowen*, 487 U.S. at 905; *see infra* Part IV (describing imminent irreparable harm).

## II.    The Organizational Plaintiffs Have Standing.

The organizational plaintiffs—AAU, APLU, and ACE—have standing to bring this suit on behalf of their university members.  An association has standing to bring suit on behalf of its individual members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  "Actions for declaratory, injunctive and other forms of prospective relief"—as Plaintiffs seek here—are "particularly suited to group representation."  *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).

First, AAU, APLU, and ACE's members have standing to sue as individuals.  *See Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248, 265 (1st Cir. 2023).  The university members face immediate and severe consequences should the Rate Cap Policy take effect— deleterious results that could be averted if this Court were to enjoin the DOE's action.  *See Plazzi v. FedEx Ground Package System, Inc.*, 52 F.4th 1, 4 (1st Cir. 2022) (quoting *TransUnion LLC v.*

*Ramirez*, 594 U.S. 413, 423 (2021)).  The declarations attached to the Complaint demonstrate the injuries member schools will suffer.  For example, if the indirect cost rate was reduced to 15%, schools will face immediate short-term consequences, which may include layoffs of crucial personnel supporting research facilities and administration, *see, e.g.*, UNR Decl. ¶ 14; UPenn Decl. ¶ 13; Tufts Decl. ¶ 12; CU Boulder Decl. ¶ 12; CSU Decl. ¶ 14, and the shuttering of facilities and experiments, *see, e.g.*, Illinois Decl. ¶¶ 5(c), 8(b); Michigan Decl. ¶ 8(a).  There will also be major long-term effects from the ending of projects that will be difficult if not impossible to restart and the derailment of years of cumulative work on critical research in areas like nuclear technology, MIT Decl. ¶ 19; AI computing, Michigan Decl. ¶ 8(f); and radiation treatments for cancer, Wisconsin Decl. ¶¶ 4-5.  These imminent injuries would be redressed by the relief requested: declaratory and injunctive relief preventing Defendants' harmful Rate Cap Policy from taking effect.  *See Housatonic River Initiative*, 75 F.4th at 265.[3]

Second, the interests at stake are not only "germane" to AAU, APLU, and ACE's purposes, but are intrinsically tied to their missions.  *See id.* at 264-66.  AAU's "primary goal is to provide a forum for the development and implementation of institutional and national policies promoting strong programs of academic research and scholarship and undergraduate, graduate, and professional education"; APLU advocates for "public impact research" with a positive impact on society; and ACE's mission is to advocate for public policy that supports the interests of its members, including in obtaining support for academic research. AAU Decl. ¶ 3; APLU Decl. ¶ 4; ACE Decl. ¶ 4.  Finally, AAU, APLU, and ACE's individual members are not required for the claims asserted or the relief requested by the organizations.  Enjoining the Rate Cap Policy will offer the individual members

---

[3] For these reasons, the individual school plaintiffs have standing in their own right.

complete relief. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) (reasoning that this requirement is met where "the remedy, if granted, will inure to the benefit" of all members). The Rate Cap Policy's proposed 15% indirect cost rate and threatened grant terminations would inflict existential injuries to their research programs and therefore, to their functioning as institutions. *See infra* Part IV. An injunction here will equally redress the injuries of AAU, APLU, and ACE and their member institutions.

## III.    Plaintiffs Have a Strong Likelihood of Success on Their Claims.

Courts must hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, Plaintiffs are likely to succeed in showing that the Rate Cap Policy violates those standards in myriad respects.

### A.    The Rate Cap Policy Violates 2 C.F.R. § 200.414.

As in *NIH*, the Rate Cap Policy unlawfully conflicts with the plain text of 2 C.F.R. § 200.414 in numerous ways by substituting negotiated indirect cost rates with an across-the-board 15% rate. *See NIH*, 2025 WL 702163, at *10. "An agency may not . . . simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations." (internal quotation marks and citation omitted)). Just as in the NIH case, DOE's Rate Cap Policy fails to fulfill the "regulatory mandates" of Section 200.414. In particular, 2 C.F.R. § 200.414(c)(1) states that negotiated indirect cost rates "must be accepted by all Federal agencies," unless narrow exceptions apply. DOE's view—that it may simply *announce* that it prefers a different indirect cost rate and apply it across the board to all universities, regardless of their actual indirect costs or how well-justified is a higher rate—would render this mandatory

23

provision optional and eliminate the important protections that it has long provided to universities.

No surprise, the text of the regulations' narrow exceptions rebels against DOE's unmoored, stability-destroying view. "A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award *only* when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." 2 C.F.R. § 200.414(c)(1) (emphasis added). In turn, 2 C.F.R. § 200.414(c)(3) states: "The Federal agency *must* implement, and make publicly available, the policies, procedures *and* general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." (emphasis added).

By announcing a single, unconditional "policy" setting indirect cost rates at 15%—regardless of the applicable negotiated rate—the Rate Cap Policy violates these requirements. These requirements together at most authorize the agencies to announce policies or procedure governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate. They do not license agencies to, by fiat, wipe out all negotiated rates for institutions of higher education. As in *NIH*, the Rate Cap Policy "at best provides a summary explanation of [DOE]'s policy to cut all [indirect cost rates] to a standard 15% rate for *all* existing and future Federal grants" to universities and "fails to fulfill the above regulatory mandates." 2025 WL 702163, at *10. While the Rate Cap Policy insists that it "sets forth [DOE's] policies, procedures, and general decision-making criteria," it does no such thing: a categorical dictate of a 15% rate is not a "procedure" and does not set forth "general decision-making criteria" under the plain meaning of those terms.[4]

---

[4] *See procedure*, *Merriam-Webster*.com, https://www.merriam-webster.com/dictionary/procedure (last visited Apr. 14, 2025) (A "procedure" is a "series of steps followed in a regular definite order."); *criterion*, *Merriam-Webster*.com, , https://www.merriam-webster.com/dictionary/criterion (last visited Apr. 14, 2025) (Criteria are "standard[s] on which a judgment or decision may be based.").

Moreover, the regulation states that DOE must implement the policies, procedures, and criteria it "*will* follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3) (emphasis added). DOE skipped the first step—it never enacted any policies, procedures, or criteria—and attempts to accomplish these distinct and mandatory regulatory requirements in one fell swoop. Here, as in *NIH*, DOE "ignore[d] the separate requirements" and failed to "comply with the step-by-step process mandated by the language of the regulation." 2025 WL 702163, at *10. Nor is this step-by-step process some ticky-tack procedural requirement: Its purpose is to authorize agencies to create general procedures and criteria that will arrive at an *actual* indirect cost rate, even if different from the negotiated indirect cost rate. It does not allow agencies to wave a magic wand and—poof—transfigure a different indirect cost rate from thin air.

Reinforcing that conclusion, Section 200.414(c)(3) authorizes "deviations" from negotiated rates. 2 C.F.R. § 200.414(c)(3). A "deviation" is a "departure from a standard or norm." *Deviation*, *Dictionary.com*, https://www.dictionary.com/browse/deviation (last visited Apr. 14, 2025). It does not embrace the wholesale elimination of the standard use of negotiated rates across broad swathes of institutions. *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) (holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Biden v. Nebraska*, 600 U.S. 477, 494-95 (2023) (similar). As the *NIH* Court again observed in a different context, a "single [indirect cost rate] capped at 15% is certainly a different approach than" the approach contemplated by the regulations—"negotiating ICRs institution by institution with deviations allowed in limited, justified circumstances." *NIH*, 2025 WL 702163, at *13.

The Rate Cap Policy also contravenes Section 200.414(c)(4), which requires federal agencies to include in the "notice of funding opportunity" "the policies relating to indirect cost rate reimbursement." 2 C.F.R. § 200.414(c)(4). The Federal Register notice promulgating this provision

makes clear that any attempt to depart from negotiated rates must first be "established" and then "inclu[ded] . . . in the announcement of funding opportunity." 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). But DOE seems to treat the Rate Cap Policy itself as setting forth the "policies, procedures, and general decision-making criteria for establishing indirect cost rates" for institutions of higher education. Compl. Ex. 1. That precisely reverses the sequencing provided by Section 200.414(c)(4).

Additionally, the Rate Cap Policy violates Section 200.414(f). That provision states that recipients that do not have a negotiated indirect cost rate "may elect to charge a de minimis rate of up to 15 percent." 2 C.F.R. § 200.414(f). It then states that "[r]ecipients and subrecipients are not required to use the de minimis rate." *Id.* The Rate Cap Policy violates this provision by setting a standardized indirect cost rate of 15% to all institutions of higher education. Indeed, the whole point of the de minimis provision is that recipients can obtain higher rates via negotiation. *See* 89 Fed. Reg. 30,046, 30,093 (Apr. 22, 2024) ("Other sections of the guidance adequately explain that recipients and subrecipients have a right to negotiate a rate, rather than using the de minimis rate."). It is utterly inconsistent with that provision to entirely bar recipients from receiving a higher rate, no matter their evidence that a higher rate is appropriate.

### B. The Rate Cap Policy Violates The Requirements For Indirect Cost Recovery.

The Rate Cap Policy is also inconsistent with the larger regulatory framework governing recovery of indirect costs. As the *NIH* Court again observed, the deviation provision "operates within a larger regulatory structure"—a structure that "expound[s] upon the identification, negotiation, and administration of indirect costs" and requires agencies and recipients to follow detailed substantive and procedural guidelines aimed at identifying the *actual* indirect costs that are reasonable and allocable to federal projects. *NIH*, 2025 WL 702163, at *9. The Rate Cap Policy wrecks that detailed

system with an across-the-board 15% figure, abandoning both the substantive and procedural requirements that the regulations set forth.

As explained above, the regulations create a reticulated scheme for setting indirect cost rates—one ensuring that grantees can recover their actual indirect costs that are reasonable and attributable to federal projects. The bedrock principle of these governing regulations is that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs less any applicable credits." 2 C.F.R. § 200.402. The regulations further establish detailed guidelines to ensure that grantees recover those costs via a detailed documentation and recovery system. *See generally* 2 C.F.R. § 200.414; Appendix III to Part 200; *accord* Appendix III(A) to Part 200 ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity"); *id.* (A)(2)(e)(1) ("Indirect (F&A) costs are the broad categories of costs discussed in Section B.1."). By slashing indirect cost rates for universities across the board to 15%, DOE will prevent grantees from recovering their indirect costs in direct contravention of this regulatory framework. The Rate Cap Policy assigns an arbitrary 15% indirect cost recovery rate across all affected institutions, squarely contradicting the principle that grantees should recover their indirect costs.

The Rate Cap Policy also departs from the existing, complex process for negotiating an indirect cost recovery rate. Under existing law, institutions must document and submit costs in great detail to support recovery. Subpart E of part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards." 2 C.F.R. § 200.100(c). 2 C.F.R. § 200.414(e) stipulates that a set of appendices will set forth in detail "[r]equirements for development and submission of indirect cost rate proposals and cost allocation

plans." Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal"). For universities, Appendix III establishes the criteria for identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs). *Id.* § 200.414(e)(1); Appendix III to Part 200. The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among multiple government projects. The Rate Cap Policy, however, dispenses with every bit of this documentation and calculation.

The Rate Cap Policy further displaces the typical process to review and validate indirect cost allocation. By existing law, the government must employ annual audits to determine what is charged to a federal award and ensure that accounting is correct. 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it elects to have a program-specific audit. This audit is performed annually, and it must be conducted in accordance with articulated standards. 2 C.F.R. §§ 200.504, 200.514. An auditor may identify any "[q]uestioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment:" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award"; (2) "[a]t the time of the audit, lacked adequate documentation to support compliance; or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results of the audit and any questioned costs are factored into negotiation of indirect cost rates. *See* Appendix III to Part 200. Again, the Rate Cap Policy ignores and is inconsistent with this comprehensive and demanding regulatory scheme.

28

**C. The Rate Cap Policy Violates Requirements For Grant Terminations.**

DOE's Rate Cap Policy is also flatly inconsistent with the regulatory requirements for grant terminations. The Policy relies on 2 C.F.R. § 200.340(a) as putative support to "terminate all grant awards to IHEs that do not conform with" its 15% cap. Compl. Ex. 1. Under that provision, agencies may terminate grants on certain enumerated grounds: "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award," 2 C.F.R. § 200.340(a)(1); "with the consent of the recipient," *id.* § 200.340(a)(2); or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," *id.* § 200.340(a)(4).

None of the enumerated grounds permits DOE to terminate grants because it would prefer to use a different indirect cost rate. In particular, while the regulation in some circumstances permits terminations "if an award no longer effectuates the program goals or agency priorities," *id.*, the Rate Cap Policy does not conclude that any award no longer effectuates DOE's priorities. The Policy invokes the need to "responsibly manage federal funds" and "improve efficiency and curtail costs as appropriate" *in general*—but that fiscal concern has nothing to do with the concerns addressed in 2 C.F.R. § 200.340(a)(4). Compl. Ex. 1.

Two other provisions underscore why Section 200.340(a) cannot provide the authority that the Rate Cap Policy claims to terminate existing grants. First, as discussed, Section 200.414(c)(4) requires federal agencies to "include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement . . . ." 2 C.F.R. § 200.414(c)(4). The Rate Cap Policy would render this provision meaningless: Agencies could simply terminate existing grants and thereby evade its requirements for the information that must be provided in the notice of funding opportunity in the first place. Under the "most basic [of] interpretative canons, . . . '[a] statute should be constructed

29

so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). The same principle applies to regulations, *see Kisor v. Wilkie*, 588 U.S. 558, 575 (2019), and that principle rebels against DOE's boundless interpretation of the termination provision.

Second, Appendix III to Part 200 provides that, "[e]xcept as provided in paragraph (c)(1) of § 200.414, Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award. Award levels for Federal awards may not be adjusted in future years as a result of changes in negotiated rates." Appendix III(C)(7)(a) to Part 200. This language affirms that the general rule is that the negotiated rate for a particular grantee—in effect at the beginning of the award—applies throughout the life of the award. The "except[ion]" applies only when a different rate from the government-wide negotiated rate is set via the procedures in Section 200.414(c)(1), which, again, DOE has not followed in issuing the Rate Cap Policy. Moreover, under Section 200.414(c), a change to the policies, procedures, and criteria governing the justification for deviations—which is what the Rate Cap Policy purports to do—must occur when the grant is being negotiated, not in the middle of an existing grant. Appendix III to Part 200 thus does not authorize a change for awards that DOE has already approved and upon which a grantee has already relied, and Section 200.340(a)'s termination authority cannot be read to render the protections of those provisions meaningless.

### D. The Rate Cap Policy Is Arbitrary And Capricious.

The Rate Cap Policy several times over runs afoul of the APA's prohibition on arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A). Under the APA, an agency must provide a reasoned basis for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

30

U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). This standard requires, at minimum, a "rational connection between the facts found and the choice made." *Id*. at 43 (quotations omitted). And an agency cannot fail to consider "important aspect[s] of the problem" in setting forth its policy explanation. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). Moreover, when an agency "changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id*. (internal quotation marks and citation omitted). Courts must judge the adequacy of an agency's rationale based only on "the grounds that the agency invoked when it took the action.'" *Id*. at 20 (citing *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *SEC v. Chenery Corp*., 318 U.S. 80, 87 (1943)). Thus, to survive arbitrary-and-capricious review, the agency's articulated explanation must be sufficient to enable a court to conclude that it "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

Here, DOE's justification consists, in its entirety, of the following:

> While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. See 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds.

DOE Rate Cap Policy. As in the *NIH* case, DOE's threadbare justification plainly fails the APA's bedrock requirements. *See NIH*, 2025 WL 702163, at *16-*21.

*First*, this justification is entirely conclusory; as in the *NIH* case, DOE has "failed to provide any reasoning, rationale, or justification at all." *Id*. at *17. This violates DOE's obligation "to

examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 588 U.S. at 773. DOE denigrates "indirect cost payments" as "not for the Department's direct research funding." Compl. Ex. 1. But DOE acknowledges that indirect costs are often necessary for DOE's own research to continue. *See id.* Then, DOE avers that it "must ensure it is putting [the American people's funds] to appropriate use on grant programs," without explaining why indirect costs are *not* an appropriate use. *Id.* Next, DOE states that the Rate Cap Policy will "improve efficiency and curtail costs where appropriate," without explaining how slashing funding for facilities and administrative costs will improve efficiency and ignoring that the Rate Cap Policy will cut funding across the board, not just "curtail[ing] costs *where appropriate*." *Id.* Finally, DOE says that the Rate Cap Policy "seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds," without explaining why maintaining its decades-long approach to indirect costs is inconsistent with its obligation to responsibly manage federal funds. *Id.* The three conclusory sentences of purported justification reveal a "disconnect between the decision made and the explanation given" that is fatal to the Rate Cap Policy. *New York*, 588 U.S. at 785; *see NIH*, 2025 WL 702163, at *17.

*Second*, the Rate Cap Policy is arbitrary and capricious because it reflects a new policy resting upon factual findings that contradict those which underlay the prior policy of OMB and DOE. The "existing [indirect cost rate] negotiation process contemplates the need for an individualized analysis at the institution level, as well as the dramatically different needs of those varying institutions." *Id.* at *19. The Rate Cap Policy "failed to acknowledge those circumstances, nor provides any justification for that disregard." *Id.*; *cf. Fox Television Stations*, 556 U.S. at 515 (stating if a "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its

32

prior policy has engendered serious reliance interests," an agency's failure to consider such factors "would be arbitrary or capricious").

Moreover, DOE ignores what *Congress itself* said about a nearly identical proposal to cap NIH indirect cost rates. According to the House of Representatives, "[t]he Administration's proposal to drastically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. 115-244, at 50. And according to the Senate, such a cap "would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide," with the effect of "throwing research programs across the country into disarray." S. Rep. 115-150, at 109. What was true of biomedical research is just as true of the research funded by DOE. And while Congress may have limited the appropriations rider to the specific proposal before it (cutting indirect cost rates for NIH grantees), DOE did not so much as consider the *reasons why* Congress concluded that a categorical cap would be devasting to research. Nor did those concerns merely lurk in the Congressional Record: Just a month before the Rate Cap Policy issued, the *NIH* Court had described those concerns at length. *NIH*, 2025 WL 702163, at *12; *see also id.* at *18 ("This failure to grapple with relevant factors and facts is even more egregious in light of the drastic change from the existing ICR negotiation process.").

*Third*, the Rate Cap Policy is arbitrary and capricious because it ignores obvious problems with its categorical 15% cap, including how that cap will thwart DOE's stated goals. The press release accompanying Rate Cap Policy says that it "aim[s] at . . . continuing to expand American innovation and scientific research." Compl. Ex. 1. DOE itself acknowledges that "many grant

recipients use indirect cost payments to effectuate research funded by the Department's grant awards." *Id.* But "counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, DOE fails to grapple with the obvious problem that indirect costs are critical to supporting and maintaining the world-class research that the Rate Cap Policy purports to expand. Nor does DOE consider that the across-the-board 15% rate amounts to a decision to fund only part of the costs of research DOE supports, and ultimately amounts simply to a decision to fund less research of particular types— including research that relies heavily on expensive overhead, as cutting-edge research often does. DOE "fails to address how the money will actually be directed to cover direct costs and how that research will be conducted absent the necessary indirect cost reimbursements provided by the federal government." *NIH*, 2025 WL 702163, at *17. Instead, in "cutting indirect costs without identifying a countervailing funding stream for such costs of research, the only reasonable outcome will be the discontinuing of research supported by the slashed F&A rates." *Id.* at *18; *accord id.* (NIH "seems to have ignored the need for indirect funds in the administration of *any and all* research"). DOE's failure to consider these "important aspect[s] of the problem" renders its decision arbitrary and capricious. *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 43).

*Fourth*, the Rate Cap Policy is arbitrary and capricious because DOE fails to explain why its own audits of indirect costs would not accomplish the task of "improv[ing] efficiency and curtailing costs where appropriate." Compl. Ex. 1. DOE regulations provide for a robust audit procedure to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred, and to adjust the indirect cost rate if it does not. *See* 2 C.F.R. §§ 200.1, 200.501(b), 200.504, 200.514; Appendix III to Part 200. Because audits look at specific costs, they can accomplish what DOE's blunderbuss policy cannot—identifying specific costs that can be appropriately curtailed. DOE "fails to explain the inadequacy of the existing audit system or how the auditing system differs from the

34

tracing of direct costs." *NIH*, 2025 WL 702163, at *18. "At the very least," DOE should have addressed "this alternative way of achieving" the state objectives of the Rate Cap Policy and provided "adequate reasons . . . for its abandonment." *State Farm*, 463 U.S. at 48.

*Fifth*, the Rate Cap Policy is arbitrary and capricious because it "fails in its entirety to recognize or consider the substantial reliance interests at issue." *NIH*, 2025 WL 702163, at *19; *see Regents of Univ. of Cal.*, 140 S. Ct. at 1913. As the press release accompanying the Rate Cap Policy says, "the average rate of indirect costs incurred by grant recipients at colleges and universities is more than 30%." Compl. Ex. 1. The Rate Cap Policy thus purports to slash indirect cost recovery by at least half, and in many cases, more. With regard to existing grants, the reliance interests are obvious: budgets have already been determined and research benefitting from the funding has already started. But even with respect to new grants, universities have structured their budgetary affairs on the understanding that federal agencies will follow through by paying their legally required cost reimbursement using the longstanding practice of using negotiated indirect costs and rates. Universities have accordingly made costly decisions about long-term investments, such as what physical infrastructure should be built, in reliance on negotiated rates with federal agencies allowing for the recovery of some such costs via depreciation, as well as the OMB regulations generally requiring agencies to use a negotiated indirect cost rate and permitting deviations from that rate only in narrowly limited circumstances. DOE's Rate Cap Policy "fails to contemplate the budgets of these institutions, formulated months and years before this Notice's sudden implementation. . . . It fails to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed." *NIH*, 2025 WL 702163, at *20.

*Sixth*, the Rate Cap Policy is arbitrary and capricious because, without explanation, it imposes its new categorical 15% cap only on universities. If (counterfactually) this categorical cap improved

efficiency or reflected responsible stewardship of federal funds, DOE does not explain why it imposed that policy on only one class of recipients rather than across the board. The press release accompanying the policy states that the average indirect cost rate for universities is "a significantly higher rate than other for profit, non-profit and state and local government grant awardees." Compl. Ex. 1. But DOE does not account for the possibility that universities' rates are higher because they engage in a larger proportion of cutting-edge research, which typically has higher indirect costs. Nor does DOE say what average indirect cost rates are for "for profit, non-profit and state and local government grant awardees" or explain why, whatever those percentages are, those institutions should not be subject to the same 15% cap. *Id.* And in fact, publicly available information suggests that indirect cost rates for non-university recipients is often as high or higher. Compl. ¶ 38. But whatever the truth, one thing is for sure: DOE did not acknowledge or address this obvious problem with its chosen course of action.

For all these reasons, Plaintiffs are likely to succeed on the grounds that the Rate Cap Policy is an arbitrary and capricious agency action.

### E. The Rate Cap Policy Is Contrary To The Statutes Authorizing DOE To Make Grants.

DOE awards research grants pursuant to various statutes, and Congress has authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437 (*codified at* 41 U.S.C. § 4708). None of these statutes, however, authorize the Rate Cap Policy. Indeed, the Policy violates 41 U.S.C. § 4708 because it does not set a rate for "payment of reimbursable indirect costs" within the meaning of the statute. It simply adopts an arbitrary 15% figure.

Moreover, the Rate Cap Policy is likely to have devastating effects across the country, not only on the research institutions themselves but also the many people who depend on the research that will be crippled by the Rate Cap Policy. The Supreme Court has underscored that agencies may not enact sweeping rules of this sort without express congressional authorization. In considering whether agency action is authorized by statute, courts consider whether the "history and breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion" counsel in favor of "hesitat[ing] before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721 (internal quotation marks omitted) (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159–60). Here, no Act of Congress expressly authorizes DOE to devastate research by enacting a radical change from institution-specific negotiated rates to a single across-the-board rate. Thus, under the major questions doctrine, DOE cannot impose such a change unilaterally. Because Congress did not expressly authorize the DOE to obliterate the cutting-edge research it has long funded, the Rate Cap Policy is invalid.

### F. The Guidance Is Impermissibly Retroactive.

The Rate Cap Policy is further in excess of DOE's statutory authority because it is retroactive. *See NIH*, 2025 WL 702163, at *27. Agencies do not, absent express statutory authority, have the power to promulgate retroactive rules. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). Why that is so is clear enough: Retroactive rules are profoundly disruptive and raise significant fairness concerns. *See Brimstone R.R. & Canal Co. v. United States*, 276 U.S. 104, 122 (1928) ("The power to require readjustments for the past is drastic" and "ought not to be extended so as to permit unreasonably harsh action without very plain words.").

37

Here, there is no indication whatsoever that DOE has the authority to make the Rate Cap Policy retroactive. Congress did not authorize DOE to retroactively modify indirect cost rates when it enacted DOE's grantmaking authority, or in any other statute. Nor can DOE evade this problem by purporting to apply the 15% cap only to new grants while terminating all existing grants with higher caps. The reduced rate necessarily undermines project budgets that were previously approved and upsets institutions' commitments made in reliance upon those budgets. In so doing, the Rate Cap Policy is retroactive thrice over: It "impair[s] rights a party possessed when [it] acted, increase[s] a party's liability for past conduct, [and] impose[s] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). The Rate Cap Policy's retroactivity is a final, independent reason that it is unlawful.

## IV.   THE OTHER FACTORS FAVOR A TEMPORARY RESTRAINING ORDER.

The remaining factors—irreparable harm, balance of the equities, and the public interest—also weigh strongly in favor of emergency injunctive relief here, just as they did in the NIH case. *NIH*, 2025 WL 702163, at *27-32.

### A.   The Rate Cap Policy Is Poised To Inflict Irreparable Harm.

Plaintiffs face irreparable harm to their missions, core infrastructure and facilities, research agendas, critical personnel, and operating budgets. That harm is substantial, likely in the absence of an injunction, and not compensable by money damages. *Doe ex rel. Doe v. Portland Pub. Schs.*, 701 F. Supp. 3d 18, 38 (D. Me. 2023).

Plaintiffs' members drive significant advances in knowledge through scientific research. *See* AAU Decl. ¶ 4; ACE Decl. ¶ 9; APLU Decl. ¶¶ 6, 8; Wisconsin Decl. ¶ 4; MIT Decl. ¶¶ 18-21; Tufts Decl. ¶¶ 5, 8; MSU Decl. ¶ 4; Michigan Decl. ¶ 4; Caltech Decl. ¶ 4; CSU Decl. ¶ 4; CU Boulder Decl. ¶¶ 4-5; BU Decl. ¶ 5; Illinois Decl. ¶ 5; Cornell Decl. ¶¶ 6-9. Uniformly reducing the indirect cost

rates of Plaintiffs' grants to 15% creates "[o]bstacles [that] unquestionably make it more difficult for . . . [Plaintiffs] to accomplish [their] primary mission." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, __ F. Supp. 3d __, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). *See, e.g.*, AAU Decl. ¶¶ 3, 9-10, 16; APLU Decl. ¶¶ 4, 11-12, 19; ACE Decl. ¶ 4, 9-10; MIT Decl. ¶ 17; Wisconsin Decl. ¶¶ 5, 12-13; MSU Decl. ¶¶ 13-14; Michigan Decl. ¶¶ 5-7; Caltech Decl. 14, 16-17; CSU Decl. ¶¶ 5-7, 14; CU Boulder Decl. ¶ 6; Illinois ¶¶ 6-8; BU ¶¶ 6-8; Cornell Decl. ¶¶ 17-21. Moreover, absent urgent intervention by the Court, harm is very "likely" to occur. *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22-23 (2008); *see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

This harm will occur imminently—potentially as soon as today. The Rate Cap Policy states unequivocally that "the Department *is undertaking* action to terminate all grant awards to IHEs that do not conform with this updated policy." Compl. Ex. 1 (emphasis added). That is, DOE is poised to put grant recipients to a choice: Either accept reductions in indirect cost rates, or face terminations. And as soon as recipients face that choice, the harm will be immediate and irreparable.

If Plaintiffs are required to choose between termination and a 15% indirect cost rate that does not cover their true costs, they will often have to choose termination—as universities will not be able to sustain this research at that rate. *See, e.g.*, AAU Decl. ¶ 18; APLU Decl. ¶ 24. In some cases, universities have undertaken DOE-funded research to support the national interest, such as in advancing nuclear knowledge and educating the nation's nuclear work force, and they can only sustain these programs because their cost is supported by DOE. AAU Decl. ¶ 1 ("Both these specialized facilities and dedicated personnel are used to educate the nuclear workforce for the country, and perform critical R&D work, which could not be funded from the university's own budget. The university can currently sustain those programs because their cost is supported by DOE in service of

39

the national interest.  If DOE does not cover those costs, the programs will be unsustainable and they will almost certainly be shut down."); Michigan Decl. ¶ 8(a) ("The Michigan Ion Beam Facility, Plasma Laboratory, and LINAC Laboratory would be forced to operate at severely reduced capacity or face complete shutdown, eliminating critical national user facilities that serve dozens of research groups across the country annually."); CU Boulder Decl. ¶ 6 (explaining that DOE's cut "would end or seriously jeopardize" research projects "spanning renewable energy, materials science, atmospheric studies, and advanced energy systems").  Even if universities might prefer to continue particular research or training programs without DOE support, the costs are very often too great, AAU Decl. ¶ 20; APLU Decl. ¶ 22; Cornell Decl. ¶ 17; MIT Decl. ¶¶ 17, 19; Brown Decl. ¶ 12; hence, most universities cannot simply make up for the loss in funding on their own.  *See* BU Decl. ¶ 16; CSU Decl. ¶ 19; Tufts Decl. ¶ 17; CU Boulder Decl. ¶¶ 17-18; Illinois Decl. ¶ 18; Cornell Decl. ¶¶ 22-24.

The result will be that myriad critical research programs will be disrupted or stopped altogether.  For example, unless enjoined, the DOE rate cut "would end or seriously jeopardize" research projects at the University of Wisconsin to develop novel radioactive drugs to diagnose and treat cancer, to develop fuels from home-grown agricultural residues, to upgrade the electrical grid in Wisconsin's rural communities, and to advance cybersecurity for nuclear microreactors—imperiling projects "that are the result of years or decades of successful efforts" and that are poised to bear fruit, if only the projects are allowed to continue.  Wisconsin Decl. ¶¶ 4-5.

At MIT, the projects that would be severely disrupted or stopped altogether include development of "a next-generation research reactor, MITR-3, [that] would greatly augment the U.S. irradiation capabilities in support of the development of advanced nuclear reactor technologies," as well as "technologies for nuclear security arms control treaty verification. These technologies will

40

help to reduce the risk of nuclear war, deter nuclear terrorism, and thus keep America safe." MIT Decl. ¶ 19.

At the University of Illinois, researchers who are in the "final phase of completing critical experiments and disseminating findings on materials for soft electronics used in robotics, energy storage, and solar energy" would need to "immediately interrupt experiments, terminate student and postdoctoral work, and dismantle collaborations with critical partners like Argonne National Laboratory" because their research depends on indirect costs shared across the School of Chemical Sciences and the Materials Research Laboratory. Illinois Decl. ¶¶ 5(c), 8(b).

And at Rochester, loss of funding for indirect costs at the Laboratory for Laser Energetics (LLE)—which receives $99.4 million in funding through a cooperative agreement from DOE, Rochester Decl. ¶ 9—would result in setbacks to foundational research in fusion energy and would adversely impact the university's research related to the Omega laser facility, impairing work that is vital to our national security, *id.* ¶¶ 11(d), (f)-(g). The LLE is also a one-of-a-kind training ground for nuclear scientists and is essential to work done by DOD, DOE, and others, *id.* ¶ 13(f), while also being a significant driver of the regional economy in central New York, *id.* ¶ 8.

These projects, once stopped, cannot simply be restarted later: The loss of human capital, and sometimes the degradation of physical infrastructure, is simply too great. "Complex DOE projects involving specialized instrumentation, hazardous materials protocols, or long-term student and faculty commitments often require months of preparation and coordination; restarting them from a non-operational state would mean re-certifying labs, rehiring or retraining staff, reestablishing security clearances, and navigating sponsor re-approval processes." UNR Decl. ¶ 16; *see* Michigan Decl. ¶ 15(c) ("High-precision research equipment and specialized facilities would face accelerated deterioration without proper maintenance, making future restart costs prohibitively expensive and

41

potentially rendering national research capabilities permanently lost."); MSU Decl. ¶ 16 (reductions in indirect cost reimbursement would reduce MSU's ability to support high-quality federally compliant research and make it difficult to restart, even if funding is later restored); Rochester Decl. ¶ 17 ("loss in funding will jeopardize the fundamental security, integrity and operability of these vital installations" in the LLE, including the $600 million government-owned lasers that are maintained by a staff of highly trained scientists, many with high-level security clearances); *id.* ¶ 19 ("Loss of funding to LLE will jeopardize the University's ability to operate and maintain" the Consensus supercomputer); *id.* at ¶ 21 (if grants were terminated, "LLE would likely close and its uniquely qualified and experienced scientific staff would likely be laid off"). Furthermore, some of the losses would occur in rapidly evolving and highly competitive fields, like fission and fusion technologies and AI computing, "leaving American researchers at a competitive disadvantage against foreign institutions" and "surrendering technological leadership in energy security, advanced materials, and defense capabilities to foreign competitors who continue to strategically invest in these critical domains." Michigan Decl. ¶¶ 8(f) & 17; *see* AAU Decl. ¶ 13(d); APLU Decl. ¶ 6; MSU Decl ¶ 8; CU Boulder ¶ 5(d); Brown Decl. ¶ 20; Illinois Decl. ¶ 17. These "existential injuries" undeniably rise to the level of irreparable harm, *National Council of Nonprofits*, 2025 WL 368852, at *12-13; there is no "possibility [of] adequate compensatory or other corrective relief . . . at a later date." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (quotation omitted).

The human cost, too, will be grave. With such deep cuts to indirect cost rates, universities will have to start reducing staff immediately; at the University of Nevada–Reno, for example, "technical staff who support facilities like the Nevada Terawatt Facility or the Mackay Mines labs, such as safety officers, lab technicians, and equipment specialists, would likely have their positions reduced or eliminated"—"compromis[ing] safe operations and slow[ing] experimental progress." UNR Decl.

¶ 14.   At the University of Pennsylvania, too, "[t]his reduction will have deeply damaging effects on UPENN's ability to conduct research from day one," including "[m]ost critically, . . . necessarily and immediately result[ing] in staffing reductions across the board."   UPenn Decl. ¶ 13; *see* Wisconsin Decl. ¶ 13 (describing the need to cut staff scientists on a project in half during this school year if F&A rate were cut to 15%); Tufts Decl. ¶ 12 (describing the need to "immediately" make "staffing reductions in both research laboratories and research administration"); CSU Decl. ¶ 14 (describing need to reduce staffing in key areas by an estimated 5-10 individuals); CU Boulder Decl. ¶ 12 (estimating that a rate cut to 15% "will correspond to a loss of approximately 25 positions"); Cornell Decl. ¶ 18 (explaining that Cornell "would be required to consider layoffs, both for research staff and research administration officers and other employees of the university who perform critical but indirect work in support of sponsored activity"); Illinois Decl. ¶ 14 (explaining the DOE Rate Cap Policy "will necessarily and immediately result in staffing reductions across the board").   Once staff are lost, universities often cannot get them back, even if funding is ultimately restored sometime later.   Moreover, universities will have to cut graduate and post-graduate trainees—irreversibly damaging their academic communities, their talent pipelines, the careers of these young researchers, and the national interest in training the next generation of scientists. *See, e.g.*, Michigan Decl. ¶ 15(a). "Loss of funding may jeopardize the ability of these young engineers and scientists to complete their training," and "[u]ltimately, loss of funding will jeopardize [the] ability to sustain, support, and develop the U.S. workforce needed to remain competitive in emerging technologies critical to U.S. national security."   UPenn Decl. ¶ 13; *see also* Cornell Decl. ¶ 18; Caltech Decl. ¶¶ 18-19; Brown Decl. ¶ 22.

Cuts in indirect cost rates will also result in "underutilized or abandoned laboratories and facilities, delayed or canceled infrastructure upgrades," and reduced "equipment maintenance

capabilities, potentially leading to safety risks in high-tech or hazardous research environments." Tufts Decl. ¶ 9; *see* Michigan Decl. ¶ 8(j) (noting likely "maintenance challenges, potentially compromising safety standards and forcing the termination of defense-critical research projects"); MSU Decl. ¶ 16 (identifying deferred maintenance of lab space that could compromise lab safety and reduce MSU's ability to provide appropriate compliance oversight); Cornell Decl. ¶ 18 (explaining that "Cornell would no longer be able to . . . properly maintain the facilities and equipment currently in use, jeopardizing the current and future conduct of the DOE-supported projects").

On top of all that, universities are currently in the process of considering whether to apply for or accept *new* grants. Universities would do so—but because they know that they cannot undertake these grants at a 15% indirect cost rate, they cannot apply for or accept these grants while the Rate Cap Policy remains in force. *See* Caltech Decl. ¶ 15 (noting that the "uncertainty regarding DOE overhead policy makes it impossible to complete submission of [new grant applications], which are intended to support research in fuel technologies, quantum science and technology, and high-energy physics").

### B.  The Balance of the Equities and Public Interest Overwhelmingly Favor Relief.

The balance of the equities and public interest favor granting Plaintiffs their requested relief; these factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the Rate Cap Policy will burden Plaintiffs and grossly impair the public interest. That is because irreparable harm that the Rate Cap Policy inflicts on Plaintiffs' members and Plaintiffs' research programs will also necessarily harm the public. The very purpose of these federal research partnerships is to advance energy, economic, and national security, as the declarations in this case amply reflect. Curtailing this research due to unexpected budget deficits would undermine the very aims promoted by DOE grants, and federal research funding more broadly. Indeed, it will gut the vital

44

scientific research that institutions are already undertaking.

The government, by contrast, will not suffer any harm if the Rate Cap Policy is enjoined. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf,* 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). And even aside from the Rate Cap Policy's patent illegality, the government incurs no cognizable harm from the continuation of the approach to indirect costs that has endured for decades.

## CONCLUSION

Plaintiffs respectfully urge this Court to enter an order temporarily restraining Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form; from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB; and from terminating any grants pursuant to the Rate Cap Policy or based on a grantee's refusal to accept a indirect cost rate less than their negotiated rate.

Dated: April 14, 2025

JENNER & BLOCK LLP

By: */s/ Shoba Pillay*

Shoba Pillay, BBO No. 659739
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice forthcoming*)
Lindsay C. Harrison (*pro hac vice forthcoming*)
Lauren J. Hartz (*pro hac vice forthcoming*)
Anjali Motgi (*pro hac vice forthcoming*)
Zachary C. Schauf (*pro hac vice forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
Amotgi@jenner.com
ZSchauf@jenner.com
*Attorneys for All Plaintiffs*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice forthcoming*)
James Y. Xi (*pro hac vice forthcoming*)
Kyle R. Eiswald (*pro hac vice forthcoming*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com
*Attorneys for Association of American Universities,*
*Association of Public and Land-grant Universities,*
*and American Council on Education*

## **CERTIFICATE OF SERVICE**

Counsel for Plaintiffs certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ Shoba Pillay
Shoba Pillay, BBO No. 659739
Jenner & Block LLP
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Dated:  April 14, 2025