**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10912-ADB |
| DEPARTMENT OF ENERGY, *et al*., | ) ) ) | Leave to File Granted April 18, 2025 |
| Defendants. | ) ) | |

**DEFENDANTS' OPPOSITION TO MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

# Table of Contents

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 2

Legal Standard ................................................................................................................... 3

Argument ............................................................................................................................ 4

   I.    This Court Lacks Jurisdiction Over Plaintiffs' Claims. .................................... 4

      A.   As underscored by *California*, the Court of Federal Claims has exclusive jurisdiction over Plaintiffs' claims. ....................................................................... 4

      B.   The Court lacks jurisdiction to order the relief that Plaintiffs request because the United States has not waived sovereign immunity to compel specific performance of contracts. ........................................................................... 8

      C.   Plaintiffs' claims are not reviewable under the APA. ................................... 9

          1. The Policy Flash is not a final agency action reviewable under the APA. ................. 9

          2. DOE's decisions in entering and performing grants are committed to agency discretion by law, and are not reviewable under the APA. ....................................... 12

      D.   The organizational plaintiffs lack standing to sue. ..................................... 14

   II.   Even If The Court Rules It Has Jurisdiction, Plaintiffs' Claims Are Likely To Fail On The Merits. ....................................................................................... 16

      A.   The Policy Flash is consistent with—and certainly does not violate—2 C.F.R. § 200.414 and regulations concerning indirect costs. ..................................... 16

      B.   The Policy Flash is reasoned and rational, not arbitrary and capricious. .................... 22

      C.   The Policy Flash is consistent with statutes authorizing DOE to make grants. ............ 28

      D.   The Policy Flash complies with requirements for grant terminations. ........................ 29

      E.   The Policy Flash is not impermissibly retroactive. ..................................... 30

   III.   Plaintiffs Have Not Carried Their Burden To Show That They Face Likely Imminent Irreparable Harm Absent An Injunction. ........................................ 31

   IV.   Injunctive Relief Is Not In The Public Interest. ........................................... 36

   V.   Even If the Court Declines To Vacate The Existing TRO In Its Entirety, The Court Should Vacate It In Part Because It Is Overbroad. ................................ 37

   VI.   The Court Should Stay Any Order for Preliminary Relief and Order That Plaintiffs Post Bond. ................................................................................. 38

Conclusion ......................................................................................................................... 40

## INTRODUCTION

In this lawsuit, Plaintiffs challenge an update to the Department of Energy's ("DOE") policy for awarding grant funding to institutions of higher education ("IHE"). *See* Policy Flash 2025-22: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (Apr. 11, 2025) ("Policy Flash"). Declaration of Berta Schreiber ("Schreiber Decl."), Exh. A. To support the DOE's mission of managing federal funding to the benefit of the taxpayer, going forward, all grants awarded to IHEs will default to a 15% indirect cost rate—a rate selected by the DOE as one that will "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." *Id.* at 2. The Policy Flash also provides that, subject to separate notice and guidance, and consistent with these goals, the DOE intends to terminate grants that do not conform to its updated policy. *Id.*

Plaintiffs—a number of IHEs and related organizations—ask this Court to upend the DOE's efforts to administer its grants in a way that it has concluded best furthers the needs of the Department and the American people—all so that they and the grantees they represent may receive larger indirect cost payments they claim are owed to them under the original indirect-cost terms of their grants.

This Court should decline Plaintiffs' invitation. *First*, this Court lacks jurisdiction over Plaintiffs' claims because the claims are breach of contract claims over which the Court of Federal Claims has exclusive jurisdiction—as underscored by the Supreme Court's recent decision in *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966 (Apr. 4, 2025) (per curiam) ("*California*"). *Second*, even if this Court should find that Plaintiffs' claims were tenable under the Administrative Procedure Act ("APA") despite *California*, they are not ripe for judicial review because 1) the Policy Flash is not a final agency action with respect to existing grants and, in fact, recognizes that there will be future grant-specific action with respect to any terminations; and 2)

1

the DOE's decisions regarding future grants are discretionary. *Third*, even if Plaintiffs' APA claims were subject to judicial review, they still fail on their merits. The Policy Flash was issued in accordance with governing regulations, runs afoul of no statute, and provides a reasoned explanation that is neither arbitrary nor capricious. *Lastly,* Plaintiffs have failed to show that they will suffer irreparable harm without a temporary restraining order (TRO).

The Court should deny Plaintiffs' motion and dissolve the Temporary Restraining Order issued on April 15, 2025.

## BACKGROUND

The DOE's mission is to ensure America's security and prosperity by addressing its energy, environmental, and nuclear challenges through transformative science and technology solutions.[1] To further that objective, the DOE funds Department-sanctioned research by awarding grants to IHEs across the country. Schreiber Decl., Exh. A at 1. Generally, these grants cover two kinds of costs: 1) "direct costs" that are directly tied to a specific research project or activity; and 2) "indirect costs" that are not tied to a specific research project or activity. *Id.* Indirect costs are further broken down into two subcategories: A) "facilities costs" that include "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and maintenance expenses"; and B) "administration costs" that include "general administration and [other] general expenses" like funding for the "director's office, accounting, [and] personnel." *Id.*

This case concerns indirect costs in grant agreements. Prior to the Policy Flash, the DOE's indirect cost rate for each IHE was typically negotiated by either the Department of Health and Human Services or the Department of Defense's Office of Naval Research, depending on which

---

[1] *See* http://www.energy.gov/mission (last visited April 16, 2025).

2

of the two agencies provided more funds to the relevant institution in the last three years. Schreiber Decl., Exh. A at 2 (citing 2 C.F.R. pt. 200, app. III(C)(11)(a)(1)). Though the DOE generally by default must accept a negotiated rate, *see* 2 C.F.R. § 200.414(c)(1), it may deviate from this procedure for "a class of Federal awards" provided that it implements and makes publicly available "the policies, procedures, and general decision-making criteria" it will follow when seeking and justifying deviations. 2 C.F.R. § 200.414(c)(3)*.*

The DOE followed those provisions when it adopted the Policy Flash. The Policy Flash applies only to one "class of Federal awards"—DOE grant awards to IHEs. Schreiber Decl., Exh. A at 1. And, via the Policy Flash, it has "implemented" and "made publicly available" its "policies, procedures, and general decision-making criteria" about the need for the change. To "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people", and to reallocate grant money so that it goes directly to the research the DOE is funding, the DOE will be implementing a standard 15% indirect cost rate for all IHEs. Schreiber Decl., Exh. A at 2. The Policy Flash also provides that DOE will be "undertaking" action to terminate "grant awards to IHEs that do not conform" with the updated policy, but that it will send "separate notice and guidance" to "[r]ecipients subject to termination." *Id.*

## LEGAL STANDARD

A TRO, like a preliminary injunction, "is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement, Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of the equities

3

favor the movant, and (4) an injunction is in the public interest. *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2022). The last two factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and is "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Of course, as a threshold matter, a court must have jurisdiction to enter a temporary restraining order. *Lowenthal v. Massachusetts*, No. 14–13631–GAO, 2014 WL 5285615 at *2 (D. Mass. Oct. 14, 2014).

## ARGUMENT

### I.    This Court Lacks Jurisdiction Over Plaintiffs' Claims.

Before addressing the merits of a temporary restraining order application, the Court must assess whether it has subject matter jurisdiction. *See Acosta Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obligated to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case"); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (recognizing that complaint must be dismissed in its entirety if subject matter jurisdiction is lacking). Plaintiffs bear the burden of demonstrating subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Here, Plaintiffs have not proven this Court has subject matter jurisdiction.

### A.    As underscored by *California*, the Court of Federal Claims has exclusive jurisdiction over Plaintiffs' claims.

The Tucker Act confers exclusive jurisdiction on the United States Court of Federal Claims to hear cases involving express or implied contracts with the United States which exceed $10,000. 28 U.S.C. § 1491(a)(1); *see Tortorella v. United States,* 486 F. Supp. 2d 159, 161 (D. Mass. 2007);

4

*Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1987). Therefore, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004); *see also Glaskin v. Klass*, 996 F. Supp. 67, 72 (D. Mass. 1998). This jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

In *California*, the Supreme Court addressed this issue in the same context in which Plaintiffs' claims arise, i.e., grant awards. 145 S. Ct. 966. The Supreme Court explained that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968-69. Instead, according to the Supreme Court, suits seeking relief like that sought by the *California* plaintiffs belong in the Court of Federal Claims:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988).[2] But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

---

[2] Plaintiffs rely on *Bowen*, but the Supreme Court held in *California* that *Bowen* does not take lawsuits—like this one—to compel the payment of money under grants out of the Tucker Act's grant of exclusive jurisdiction to the Court of Federal Claims. And for two good reasons: *First*, *Bowen* did not involve a claim for breach of contract; rather, in holding the Tucker Act inapplicable to a State's claim under the Medicaid Act, the Court stressed both the statutory nature of the cause of action generally and features of the Medicaid Act specifically—underscoring that the case (unlike this case) did not implicate the Tucker Act's application to contract claims. *Bowen*, 487 U.S. at 900 n.31. *Second*, the Court emphasized that suits under the Medicaid Act generally arise between the federal government and a State, implicating federalism concerns that generally do not arise in disputes over the terms of grants. *Id.* at 900 n.31, 904 n.39, 907-08.

*Id.* at 969.

Plaintiffs attempt to shoehorn their claims into the APA by styling their complaint as one for injunctive relief and then arguing that there is no statute that "expressly or impliedly forbids the relief that is sought."  Doc. 19, p. 17.  But this is precisely what the plaintiffs argued in *California*, and this reasoning was rejected by the Supreme Court.  145 S. Ct. 968-696.  The fact that Plaintiffs "root their claims in federal statutes and regulations" instead of contract terms does not change the result.  Just last week, another session of this Court rejected that argument in a similar case involving grant terminations.  *See Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*, 3:25-cv-30041 (Text Order entered Apr. 14, 2025).  Citing *California*, this Court found that, even though plaintiffs based their claims on federal statutes instead of contracts, their claims still "sought to enforce a contractual obligation to pay money."  *Id.*  It went on to dissolve its own temporary restraining order based on the Supreme Court's "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims."[3]  *Id.*

Even before the Supreme Court's decision in *California*, the First Circuit held that where "the essence of the [Plaintiffs'] action is in contract," a plaintiff may not evade the Tucker Act's exclusive grant of jurisdiction "by the mystique of a different form of complaint," such as a suit under the APA.  *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978)[4]; *see also Diaz*

---

[3] Other district courts have also changed course in light of the Supreme Court's decision in *California*.  For example, in *New York v. Trump*, the District of Rhode Island granted an emergency motion to stay the order enforcing the preliminary injunction.  *See New York v. Trump*, 1:25-cv-39 (Text Order entered Apr. 7, 2025).

[4] In *Massachusetts v. Nat'l Insts., of Health (NIH)*, No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025), the court mentioned *Califano* only once in passing—wholly ignoring it in the portion of the preliminary injunction order applying its understanding of the law to reject the defendants' jurisdictional argument under the Tucker Act.  And the court obviously did not apply *California*, because the Supreme Court had not yet entered its order in that case.

*v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (holding that plaintiff "cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"). And, here, Plaintiffs seek to compel continued payment of money under the terms of grants, and to prevent the termination of grants—all of which is to say Plaintiffs seek continued payment under contracts.[5] *See* Doc. 1 (requesting an injunction against "terminating any grants pursuant to the Rate Cap Policy or based on a grantee's refusal to accept an indirect cost rate less than their negotiated rate"). "[D]espite [Plaintiffs'] valiant effort to frame the suit as one for declaratory or injunctive relief"—or as a suit under the APA—"this kind of litigation should be understood for what it is," a "suit for money for which the Court of Federal Claims can provide an adequate remedy," and which "therefore belongs in that court." *Suburban Mortg. Assocs. v. U.S. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1118 (Fed. Cir. 2007); *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-465, 2025 WL 763738, at *7 (D.D.C. Mar. 11, 2025) ("Sure, the Conference seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the Conference."). Just as the Supreme Court held in *California*, so too should this Court hold in this case.

---

[5] Plaintiffs also seek to compel the use of negotiated indirect cost rates in future grants. That is a premature claim to compel the payment of money under contracts that do not yet exist or, alternatively, a claim to compel the Government to contract on Plaintiffs' preferred monetary terms in the future. Either way, Plaintiffs cannot evade the Tucker Act's grant of exclusive jurisdiction to the Court of Claims by bringing premature, foredoomed claims seeking money under contracts with the Government. *See Klauber v. VMware, Inc.*, 80 F.4h 1, 14 (1st Cir. 2023) (noting that, for breach, there must first be a valid, binding contract); *Terran ex rel. Terran v. Sec'y Health & Hum. Servs.*, 195 F.3d 1302, 1309 (Fed. Cir. 1999) (underscoring that Tucker Act does not create a substantive cause of action against United States and plaintiff must point to the "contract with the United States that gives him a right to money damages"). In the case of future grants, no such contracts exist.

**B.** **The Court lacks jurisdiction to order the relief that Plaintiffs request because the United States has not waived sovereign immunity to compel specific performance of contracts.**

The Court lacks jurisdiction to grant the relief that Plaintiffs request because that relief would bar DOE from terminating grant agreements—compelling the United States to specifically perform those agreements—and Congress has not waived the United States' sovereign immunity for that relief. The United States cannot be sued unless it waives sovereign immunity, which waiver must be strictly observed and are not lightly implied. *Block v. North Dakota*, 461 U.S. 273, 287 (1983). First Circuit precedent recognizes that the United States has not waived sovereign immunity for specific performance and requires courts to dismiss actions that would compel the United States to perform a contract. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3-4 (1st Cir. 1989) (stating "[w]e are unaware of any waiver of sovereign immunity by the United States as to specific performance for breach of contract" and dismissing for lack of subject matter jurisdiction).

Here, Plaintiffs ask the Court to compel specific performance of the grants by, for example, "enter[ing] an order temporarily restraining Defendants" from "terminating any grants pursuant to the Rate Cap Policy or based on a grantee's refusal to accept an indirect cost rate less than their negotiated rate." Of course, if the Court bars DOE from terminating grant agreements, then the Court is ordering DOE to perform those agreements by paying the grants. Because courts cannot order agencies to specifically perform agreements, a district court in Utah—citing the First Circuit's holding in *Coggeshall*—recently dismissed a purported APA claim brought by a grantee against the Small Business Administration ("SBA") following SBA's termination of a grant. *Imaginarium LLC v. United States Small Bus. Admin.*, 618 F. Supp. 3d 1225, 1232 (D. Utah 2022). There, SBA approved a grant then denied the grant, and the grantee sued including for declaratory relief under the APA that would order the SBA to follow the grantee's view of the law. *Id.* at 1228,

8

1231.  The court explained "some of Plaintiff's requests for declaratory judgment require the Court to order specific performance by the SBA of its alleged contractual obligations to Plaintiff—this is well beyond the Court's power."  *Id.* at 1232.  Other claims for damages, the court transferred to the Court of Federal Claims.  *Id.* at 1231-32.  Just so here.

> **C.    Plaintiffs' claims are not reviewable under the APA.**

This Court lacks jurisdiction over this lawsuit even if it falls outside of the Tucker Act's exclusive grant of jurisdiction to the Court of Federal Claims.  Judicial review under the APA is not available in the absence of "final agency action"—which is lacking here.  5 U.S.C. § 704.  In addition, the APA does not allow judicial review to the extent that a relevant statute precludes it, or the agency action is "committed to agency discretion by law".  *See* 5 U.S.C. § 701(a)(1)).

> 1.    The Policy Flash is not a final agency action reviewable under the APA.

The Policy Flash is not a final agency action subject to judicial review under the APA because it does not have a legal effect or consequence.  APA review is available in most cases only for "*final* agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704 (emphasis added).  "The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review."  *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007).

Under the test first laid out in *Bennett v. Spear*, an agency action is considered "final" if two conditions are met:  first, it marks the "consummation" of the agency's decisionmaking process; and second, the action determines rights or obligations or creates legal consequences.  *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2025) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  On *Bennett*'s second prong, courts follow a "pragmatic" approach and determine whether an action is final "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *California Communities*

*Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (interpreting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

The Policy Flash is not final agency action.  It is a mechanism for communicating financial assistance-related information, but does not itself have the force or effect of law or any direct impact on an existing grant award.[6]  *See* Schreiber Decl., ¶¶ 3-7. The Policy Flash neither marks the consummation of the agency's decisionmaking process nor creates concrete consequences.  *See Harper*, 118 F.4th at 116.  The Policy Flash itself removes any doubt on this score:  It closes by promising that "[a]dditional information is forthcoming"—making clear that the formal policy marking the end of the agency's decisionmaking process and carrying concrete consequences has not yet arrived.  Schreiber Decl., Exh. A at 2.

The Policy Flash's lack of finality is particularly marked for existing grants.  The Policy Flash states that DOE "is undertaking action to terminate all grant awards to IHEs" that have an indirect cost rate greater than 15%—but that representation of ongoing actions toward a final result has no "concrete consequences" at all.  *California Communities Against Toxics*, 934 F.3d at 637.  Both before and after the Policy Flash—absent an additional action—grantees were reimbursed for indirect costs at the same rate.  Indeed, the Policy Flash states explicitly that "[r]ecipients subject to termination will receive separate notice and guidance"—meaning that any final agency action with respect to any particular current grantee is yet to come.  Schreiber Decl., Exh. A at 2.  Plaintiffs acknowledge as much, asserting that "DOE *is poised* to put grant recipients to a choice: Either accept reductions in indirect cost rates, or face terminations."  Doc. 19 at 39 (emphasis added).  A DOE termination letter like the one that Plaintiffs submitted with their April 15, 2025

---

[6] DOE's website states: "Policy Flashes transmit information and items of interest to the DOE acquisition community.  A Policy Flash itself is not a statement of policy and should not be referenced as such."  https://www.energy.gov/management/policy-flashes.

Notice has legal effect on the individual grantee that receives it, Doc. 33-1, but the Policy Flash that Plaintiffs collectively seek to challenge does not.

Indeed, the Policy Flash has even less effect than other agency guidance, policies, and memoranda that courts have held are not reviewable final agency actions because they have no practical effect. In *Valero Energy Corporation v. EPA*, for example, an oil refiner sought judicial review of an EPA-issued document that set out EPA's interpretation of a statute and that concluded that EPA's prior actions had complied with the statute. 927 F.3d 532, 536 (D.C. Cir. 2019). The D.C. Circuit dismissed, holding that the document was not a final agency action. It explained the document "only present[ed] EPA's position on what the law is and whether it ha[d] complied. Absent some identifiable effect on the regulated community, an agency works no legal effect 'merely by expressing its view of the law.'" *Id.* at 536 (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001)).

So too here: The Policy Flash has no legal effect simply by announcing a planned course of action, with a promise that any grantees subject to termination will "receive separate notice and guidance." *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1008 (9th Cir. 2021) (holding Department of Homeland Security manual was not challengeable final agency action because it did "not prescribe any particular option in any particular way" and "[a]ny guidance that could be attributed to the Manual would be subsumed" in the subsequent action).

Given that the DOE must take additional actions to create any legal effect, the Policy Flash cannot be considered a reviewable final agency action. The Policy Flash did not itself create any consequences—and certainly not against existing grantees—and any Plaintiffs injured by DOE's subsequent actions can pursue their claims in an appropriate forum. Plaintiffs' current claims, however, are not subject to APA review, and this Court therefore lacks jurisdiction.

     2.      <u>DOE's decisions in entering and performing grants are committed to</u>
                    <u>agency discretion by law, and are not reviewable under the APA.</u>

Even if Plaintiffs' claims were not based in contract, the APA precludes judicial review because DOE's grant funding decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." *Id.* at 193. These principles are not limited to lump-sum appropriations and § 701(a)(2) bars review where an appropriation confers discretion on the agency. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (2002). Any DOE actions to terminate existing grants or to offer future grants with a given indirect cost rate are non-reviewable.

Plaintiffs cannot overcome the discretion conferred by Congress. Where a decision is presumptively non-reviewable, as with funding allocation, "Congress may overcome the presumption against review by providing 'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 293 (4th Cir. 2022) (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)). This is a question of statutory interpretation. *Id.* (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988) ("[Section] 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based")).[7] So too with express conferrals of

---

[7] In *California v. U.S. Department of Education*, in addition to discussing appropriations statutes the First Circuit stated that "regulations [that] cabin the [Department of Education's] discretion," made Education's funding decisions judicially reviewable. 132 F.4th 92, 97-98 (2025). The court did not discuss whether it was appropriate to consider more than the language of the relevant appropriations statute to determine whether Congress made an agency decision reviewable. *See id.* It is not. Regulations cannot give courts jurisdiction where Congress has withheld jurisdiction by statute. As the First Circuit's decision there considered different statutes, considered different regulations, lacked discussion, and was promptly negated by the Supreme Court, it is neither binding nor persuasive.

discretion.  *See Milk Train, Inc.*, 310 F.3d at 751-52 (holding plain language of statute conferred discretion on Secretary where statute directed distribution of funds "as soon as practicable"). Congress has not set rules to provide for judicial review of the funding decisions at issue here.

Congress empowered DOE to make grants in the Department of Energy Organization Act, 42 U.S.C. § 7256, which explicitly provides the Secretary with unreviewable discretion in the entry and performance of grants.  The statute provides, in relevant part:

(a) The Secretary is authorized to enter and perform such contracts, leases, cooperative agreements, or other similar transactions with public agencies and private organizations and persons, and to make such payments (in lump sum or installments, and by way of advance or reimbursement) as he may deem to be necessary or appropriate to carry out functions now or hereafter vested in the Secretary.

(b) Notwithstanding any other provision of this title, no authority to enter into contracts or to make payments under this title shall be effective to such extent or in such amount as are provided in advance in appropriations Acts.

The Supreme Court has held that nearly identical language empowering an agency head to act as he may "deem" to be necessary or appropriate is necessarily discretionary.  *Webster*, 486 U.S. at 600.  The Court noted that reviewing what the agency head "deem[ed]" necessary would be impossible, short of cross-examining the officer.  *Id.*  By using the same language, Congress granted DOE the same discretion.

In an effort to counter this discretion, Plaintiffs cite a provision from the subsection of Title 41 of the U.S. Code that addresses procurement in general, 41 U.S.C. § 4708, which provision does not negate DOE's discretion to make funding decisions and does not overcome the presumption against review.  That provision says, in full:

A cost-type research and development contract (including a grant) with a university, college, or other educational institution may provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to the total of the reimbursable direct costs incurred or to an element of the total of the reimbursable direct costs incurred.

41 U.S.C. § 4708.  Most importantly, the statute says that the contract *may* provide for payment on the basis of predetermined fixed-percentage indirect cost rates.  *See id.*  This permissive "may provide" language is more clearly discretionary than the "shall" and "will" language analyzed in *Holbrook v. Tennessee Valley Authority*, which the Fourth Circuit determined did not overcome the presumption against non-reviewability because the statute there used "fuzzy" language elsewhere. 48 F.4th at 294.  And even if the statute here did not use "may provide" to establish discretion, the statute leaves the agency free to fix its own predetermined rate—such as 15%—and does not require agencies to use the Negotiated Indirect Cost Agreement rate that Plaintiffs demand. Plaintiffs do not cite to any statute that limits DOE's discretion to terminate a grant agreement and, as explained *infra* at Part II.D, the United States can always terminate agreements even if doing so could be a breach for which the United States must pay damages.

Plaintiffs' stated reliance on federal grants to fund ongoing research does not change this analysis.  *See Aiteliyev v. Mayorkas*, 717 F. Supp. 3d 67, 75 (D.D.C. 2024) ("Putting to the side the dubious premise that it can be reasonable to rely on an expedite decision that, by law, could be revoked at any moment, reliance alone does not wipe away the APA's statutory limits or confer jurisdiction where none exists.").

### D.    The organizational plaintiffs lack standing to sue.

To establish Article III standing, a plaintiff must demonstrate that it 1) suffered an injury in fact; 2) that is fairly traceable to the challenged conduct of the defendant, and 3) that is likely to be redressed by a favorable judicial decision.  *See Lujan*, 504 U.S. at 560-61.  Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation."  *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1281-82 (1st Cir. 1996).  Each plaintiff must demonstrate its own Article III standing, as "Article III does not give federal courts

14

the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016). And each plaintiff must also maintain its personal interest in the dispute at all stages of litigation. *See Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008). Finally, because "standing is not dispensed in gross," each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion v. Ramirez.* 594 U.S. 413, 431 (2021)).

The Organizational Plaintiffs in this case—AAU, APLU, and ACE—rely on a theory of "associational standing." Under that theory, an association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As shown by the sheer number of declarations submitted by the Organizational Plaintiffs' member institutions in an attempt to show irreparable harm, Plaintiffs fail the third requirement: Individual members must participate to show entitlement to injunctive relief—particularly if this Court follows the proper practice of limiting any injunction to those institutions that have shown that the Policy Flash will cause them irreparable harm. *See infra* at Part III.

More fundamentally, the theory of associational standing is misguided: It (1) improperly "relaxes both the injury and redressability requirements for Article III standing" by allowing the association to assert and obtain relief for someone else's injury (even in the absence of an injury of its own); (2) "subverts the class action mechanism" by allowing what amounts to classwide relief outside the strictures of Rule 23; and (3) creates the "possibility of asymmetrical preclusion,"

where the members might not be bound by the association's loss in litigation. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399-403 (2024) (Thomas, J., concurring). Thus, while Defendants recognize that the Supreme Court has recognized the theory of associational standing, they preserve their challenge to the theory of associational standing for further review.

## II.    Even If The Court Rules It Has Jurisdiction, Plaintiffs' Claims Are Likely To Fail On The Merits.

Even apart from the jurisdictional obstacles, Plaintiffs cannot obtain a temporary restraining order because they have not shown a likelihood of success on the merits. As this Court has often recognized, "proving likelihood of success on the merits is the '*sine qua non*' of [preliminary relief]." *Akebia*, 443 F. Supp. 3d at 225. "Therefore, '[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *Id.* On the merits, Plaintiffs insist that the Policy Flash is contrary to law and arbitrary and capricious. But none of their arguments succeed.

### A.    The Policy Flash is consistent with—and certainly does not violate—2 C.F.R. § 200.414 and regulations concerning indirect costs.

1.    In issuing the Policy Flash, the DOE made public what it intended to do in seeking and justifying indirect cost rates as required by 2 C.F.R. § 200.414. Subsection (c)(1) provides that a federal agency may use a rate "different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with [2 C.F.R § 200.414(c)(3)]." 2 C.F.R. § 200.414(c)(1). Subsection (c)(3), in turn, provides that the "Federal agency must implement, and make publicly available, the policies, procedures, and general decision-making criteria that their programs will follow to seek and justify deviation from negotiated rates." That is precisely what DOE did when it issued the Policy Flash: In that publicly available document, the

DOE publicized the policy and decision-making criteria that it may later use in seeking and justifying deviations from negotiated rates:  The DOE underscored that this rate is "at the high end of the 'up to 15 percent' de minimis rate permitted by government-wide regulation," *see* 2 C.F.R. § 200.414(f), and will "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people."  Schreiber Decl., Exh. A at 2.  And DOE announced the procedure it would use for applying the new policy—application of a 15% rate for IHEs.  *Id.*  The Policy Flash thus rests on a straightforward application of Section 200.414(c)(3), and as a result it satisfies Section 200.414(c)(1).

    **2.**  In arguing to the contrary, Plaintiffs improperly seek to read into Subsection (c)(3) a requirement that any "deviation" from negotiated indirect cost rates occur on a case-by-case basis.  Doc. 19 at 24-25.   But nothing in 2 C.F.R. § 200.414 imposes a case-by-case requirement that would preclude DOE from "seek[ing] and justify[ing]" a deviation from negotiated rates across the board for IHEs.  *See Fourstar v. Garden City Grp., Inc.*, 875 F.3d 1147, 1153 (D.C. 2017) (Kavanaugh, J.) ("It is not a judge's job to add to or otherwise re-mold statutory text to try to meet a statute's perceived policy objectives.  Instead, we must apply the statute as written.").

    Subsection (c)(1) provides that "[a] Federal agency may use a rate different from the negotiated rate for … a class of Federal awards."  In two ways, that provision confirms that there is no case-by-case requirement.  *First,* by using the singular "rate," Subsection (c)(1) makes clear that there need not be a separately determined indirect cost rate for each award.  And, *second*, Subsection (c)(1), and by extension (c)(3), specifically authorizes use of the non-negotiated rate for a "class of Federal awards," without limiting the size of that class.  DOE-administered awards, and certainly DOE-administered awards to IHEs, constitute a "class of Federal awards" for which

a single, non-negotiated rate may be used so long as Subsection (c)(3) is satisfied. *See* 2 C.F.R. §
200.1 ("Class of Federal awards means a group of Federal awards either awarded under a specific
program or group of programs or to a specific type of recipient or group of recipients to which
specific provisions or exceptions may apply."). The regulations thus foreclose Plaintiffs' argument
that negotiated rates must be used in the absence of granular, individualized determinations.

        **3.**    Plaintiffs' efforts to ground their position in the text of Subsection (c)(3)
fail. Doc. 19 at 25. *First*, the word "deviation" does not somehow foreclose use of a flat indirect
cost rate. A "deviation" is merely "a change from a customary or agreed-on course of action"—
and adoption of a flat rate is plainly a "change" from the "customary" default use of negotiated
rates under the regulations. *deviation*, Black's Law Dict. (12th ed. 2024) ("Generally, a change
from a customary or agreed-on course of action; a noticeable difference form what is expected or
acceptable."). *Second,* "criteria" denotes the "standard on which a judgment or decision may be
based," which is exactly what the Policy Flash provides: The Department explained that it would
adopt a 15% rate to allocate its funding more directly to its desired research and "[t]o improve
efficiency and curtail costs where appropriate" by "better balanc[ing] the financial needs of grant
recipients with the Department's obligation to responsibly manage federal funds." Schreiber Decl.,
Exh. A at 1. *Third,* "procedures" are "specific method[s] or course[s] of action"—which, here,
includes the Policy Flash's announcement that DOE will use "a standardized 15 percent cost rate
for grants awarded to IHEs." *procedure*, Black's Law Dictionary (12th ed. 2024); *procedure*,
Merriam-Webster ("a particular way of accomplishing something or of acting"),
https://www.merriam-webster.com/dictionary/procedure (last visited April 19, 2025).

        Plaintiffs' argument thus hinges entirely on Subsection (c)(3)'s use of the word "will,"
which Plaintiffs suggest requires some temporal distance between announcement of new "policies,

18

procedures, and general decision-making criteria" and actual determination of a non-negotiated rate.  Doc. 19 at 33.  But that simply reflects that there will be future action: Application of the non-negotiated rates to new grant awards, and (in this case) future action to terminate existing grant awards as suggested in the Policy Flash.  Nothing about the word "will" requires the sort of grant-by-grant determinations that Plaintiffs wrongly argue are required by Subsection (c)(3).

    **4.**  Plaintiffs fare no better in their reliance on Section 200.414(c)(4).  Doc. 19 at 25.  That provision provides that "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement."  Of course, this argument applies only to existing grants; for future grants, the new policy will be included in the notice of funding opportunity.  And Plaintiffs' argument fails even with respect to existing grants.  While Subsection (c)(4) provides that existing "policies relating to indirect cost rate reimbursement" be "include[d] in the notice of funding opportunity," that notice provision says nothing about what should happen in the event of noncompliance.  *See United States v. Aguirre-Gonzalez*, 597 F.3d 46, 55 (1st Cir. 2010) (holding language directing that action "shall" be taken within a set time was "precatory, rather than mandatory" because the statute "impos[ed] no consequence" for non-compliance).  More to the point, Subsection (c)(4) does not prohibit an agency from developing a new policy relating to indirect cost rate reimbursement nor from applying that new policy to existing grants.  *That* question is addressed by Subsections (c)(1) and (c)(3), which together allow the agency to "use a rate different from the negotiated rate," without anyway excepting existing grants.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general").  Subsection (c)(4) does not purport to displace those provisions, which authorize the Policy Flash and foreclose Plaintiffs' arguments in this case.  *See also* 2 C.F.R., Pt. 200, App. III, Section 7 (noting that an

agency may decline to "use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award" so long as it complies with 2 C.F.R. § 200.414(c)(1)).

     **5.**     Plaintiffs argue the Policy Flash violates Section 200.414(f), which authorizes grantees that do not have a negotiated rate to choose a de minimis rate. Doc. 19 at 26. That provision, which sets forth one exception to the default negotiated rate arrangement, does not purport to displace Subsections (c)(1) and (c)(3) of the very same regulation, which—again—authorize an agency to deviate from negotiated rates. The provisions simply speak to different situations: Subsection (f) allows some grantees to opt out of the default negotiated rate process, and Subsections (c)(1) and (c)(3) authorize the agency to deviate from the negotiated rates developed through that process. What matters here is that the Policy Flash complies with Subsections (c)(1) and (c)(3).

     **6.**     Plaintiffs finally turn to a more wide-ranging argument that the DOE's planned deviation from negotiated rates, as reflected in the Policy Flash, violates "the larger regulatory framework governing recovery of indirect costs." Doc. 19 at 26. Plaintiffs rest this argument on a mistaken assertion that the law imposes a requirement that grantees recover in full some objective, knowable amount of "*actual* indirect costs." *Id.*

     The law imposes no such requirement—and in fact confirms that there is no such requirement. For example a federal statute expressly allows "payment of reimbursable indirect costs on the basis of predetermined fixed percentage rates applied to the total of the reimbursable direct costs incurred." 41 U.S.C. § 4708. That is a blunt measure: Application of a predetermined fixed rate to the reimbursable direct costs will yield a number, but that number will not reflect—and certainly will not necessarily reflect—the actual amount of indirect costs that belong to any specific federal award (a concept that is itself fuzzy and leaves ample room for disagreement).

And the default negotiated rate method underscores the point: A rate arrived at through negotiation will not guarantee recovery of "*actual* indirect costs." *Id.* And even if it would, the fact remains that Subsection (c)(3) explicitly allows for "deviation[s]" from the negotiated rate.

The regulations cited by Plaintiffs are not to the contrary. Plaintiffs rely primarily on 2 C.F.R. § 200.402, which provides that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." That provision speaks only to the "total cost," making clear that allocable indirect costs are part of the "total costs" that may be charged against a grant (up to the amount of the grant), without purporting to set an indirect cost rate to be used in setting the amount of the grant—much less requiring the Government to pay for the entirety of a recipient's costs. *See Community Relations-Social Dev. Com'n v. United States*, 8 Cl. Ct. 723, 726 (1985) (explaining in similar context that a "fixed percentage of direct cost rates," as opposed to "actual allocations" or "lump sums," is simply one method of "determining allocable indirect costs" under a grant). Were it otherwise, Section 200.402 would be at war with not only Section 414(c)(1) and (3), but also the default use of negotiated rates under the regulations.

The Policy Flash likewise does not contravene Appendix III to Part 200. That Appendix "provides criteria for identifying and computing indirect … rates at IHEs (institutions)." In doing so, it simply (i) defines categories of indirect costs, such as "Depreciation," "Interest," and "Operation and Maintenance Expenses"; (ii) requires those costs to be "distributed to the major functions of the institution"; and (iii) further defines each of the "major functions of the institution." It does not purport to require an agency to pay for all of a grantee's costs, or even to adhere to the "negotiated rate" for indirect costs. In fact, it expressly notes that the grantor may

21

deviate from the negotiated rate under Subsection (c)(1)—precisely as the DOE proposes in the Policy Flash.

Nor does the Policy Flash somehow contravene the regulations relating to audits and the negotiation of indirect cost rates. Nothing about a change in indirect cost rates precludes an agency from auditing a grant recipient to ensure that the recipient is properly using federal funds. *See* 2 C.F.R §§ 200.501(b), 200.504, 200.514. And to invalidate the Policy Flash's "deviation from negotiated rates" on the ground that it is inconsistent with the provisions governing negotiations of indirect cost rates would be to read Section 200.414(c) into nonexistence. *See* 2 C.F.R §§ 200.1 (defining "Indirect cost rate proposal"), 200.100(c) (noting that "Subpart E establishes principles for determining allowable costs incurred by recipients … under Federal awards," but that they "do not address the circumstances nor dictate the extent of Federal Government funding of a particular program or project"), 200.414(e) (listing Appendices "for development and submission of indirect (F&A) cost rate proposals and cost allocation plans"). Those provisions will continue to apply whenever an agency uses negotiated indirect cost rates—but under the plain terms of Section 200.414(c) an agency is not bound to do so.

**B.    The Policy Flash is reasoned and rational, not arbitrary and capricious.**

The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA,* 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted). The agency's reasoning need only be "rational" and a court should disrupt agency action only if it "is too unreasonable . . . for the law to permit it to stand." *Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 720 (1st Cir. 1999). "The task of a court reviewing agency action under the APA's 'arbitrary and capricious'

standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (further citations omitted). A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks and citation omitted).

Contrary to Plaintiffs' suggestions, the Policy Flash is both reasoned and rational.

1.      Plaintiffs' first argument, that the DOE failed to provide a sufficient justification for the Policy Flash, must be rejected because the Policy Flash was sufficiently reasoned under arbitrary and capricious review. In the Policy Flash, DOE explained how indirect cost rates have "typically" worked at the time of the notice. Schreiber Decl., Exh. A at 2. It acknowledged reliance interests, explaining that it is "cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." *Id.*

The DOE set out its reasons for adopting a new approach despite those reliance interests. *First*, the DOE explained that it would adopt the new policy to reduce payment of indirect costs to focus its payments on the direct costs of the research it is funding—a more "appropriate use" in DOE's view. Schreiber Decl., Exh. A at 1. ("[I]ndirect cost payments . . . are not for the Department's direct research funding."). That rationale is perfectly rational: It is certainly reasonable for the DOE to focus its funding efforts by steering money directly toward the very research it seeks to fund. Plaintiffs may disagree with the DOE's choice, but that does not suffice to show that it is arbitrary and capricious. *See Penobscot Air Servs.*, 164 F.3d at 720.

*Second*, the DOE explained that it was adopting a reduced indirect cost rate to "improve efficiency and curtail costs where appropriate"—ultimately striking a policy-based balance

between "the financial needs of grant recipients with the Department's responsibility to responsibly manage federal funds." Schreiber Decl., Exh. A at 1. As with its other rationales, the DOE's desire to "improve efficiency and curtail costs" is rational—and should indeed be lauded. As recipients of federal money, Plaintiffs may not like the DOE's desire to reduce costs in protection of the public fisc, but the choice certainly is not arbitrary.

*Third*, DOE explained the basis for its new rate: Fifteen percent is "at the high end of the 'up to 15 percent' de minimis rate permitted by government-wide regulation" for grantees without a negotiated rate. Schreiber Decl., Exh. A at 2. Again, this was a rational choice: Having chosen to dispense with negotiated rates for good reason, the DOE reasonably chose the most generous rate provided in the regulations for use in the absence of a negotiated rate. The DOE's choice to use a preexisting regulatory benchmark was entirely reasonable—and indeed, natural.

**2.** Plaintiffs' second argument, that the Policy Flash "rest[s] upon factual findings that contradict those which underlay the prior policy" is simply incorrect. Doc. 19 at 32. "To prevail on a theory that an agency must provide a more-detailed explanation, a challenger must be able to identify 'new findings' that contradict prior findings on which the agency relied." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 74 (D.D.C. 2023) (*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037–38 (D.C. Cir. 2012)).

There are no new factual findings here that contradict earlier findings. Instead, the DOE has just adopted a new approach, based on new policy determinations, as expressly permitted by Subsection (c)(3). Because there are no new factual findings—and no contradiction of earlier factual findings, the "agency may change its existing position on an issue 'as long as [it] provide[s] a reasoned explanation for the change.'" *Housatonic River Initiative v. United States Env't Prot. Agency*, 75 F.4th 248, 270 (1st Cir. 2023) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S.

211, 221 (2016)). Under First Circuit law, this requires only that "'the agency display awareness that it *is* changing position,' but does not constitute a 'heightened standard' of review." *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 515, 514) (cleaned up)). "The agency 'need not demonstrate that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible, that there are good reasons for it, and that the agency *believes* it to be better.'" *Id.* (quoting *Fox*, 556 U.S. at 515) (cleaned up). The Policy Flash easily meets this standard for all the reasons just discussed.

Plaintiffs also criticize the Policy Flash for failing to consider legislative history criticizing a different proposal for adjusting indirect cost rates *in the context of biomedical research*. Doc. 19 at 33. But Plaintiffs cite no case supporting the idea that arbitrary and capricious review requires an agency to address everything anyone in Congress has ever said about a related issue. In any event, the legislative history to which Plaintiffs point concerned reliance interests, which the DOE adequately addressed, as explained infra at Part II(A)(5).

**3.**      Plaintiffs' third argument, that the Policy Flash impermissibly "thwarts" DOE's goals, must be rejected because it is an improper attempt to substitute Plaintiffs' judgment for that of the agency.  Doc. 19 at 33.  The judiciary "cannot substitute [its] own assessment for the Executive's predictive judgments . . . all of which 'are delicate, complex and involve large elements of prophecy." *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (citing *Chi. & S. Air Lines, Inc. v. Watermann S.S. Corp*, 333 U.S. 103, 1948)); *see also Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference").  The Policy Flash does not "ignore" potential drawbacks to its 15% rate, as Plaintiffs suggest; it acknowledges them explicitly.  Schreiber Decl., Exh. A at 1. ("the

Department is cognizant that many grant recipients use indirect cost payments to effectuate research"). But the Policy Flash ultimately concludes, based on the agency's expertise, that the other policy considerations discussed above—focusing on direct funding of research, reducing difficult-to-oversee indirect costs, and curtailing costs—warranted adoption of the new rate despite any potential drawbacks. Neither the Plaintiffs nor the Court can substitute their judgment for that of the DOE on this point. *See TikTok Inc.*, 507 F. Supp. 3d at 110 (recognizing that arbitrary and capricious standard does not invite courts to undertake their own factfinding).

4.      Similarly, Plaintiffs' fourth argument, that DOE fails to explain why audits will not improve efficiency and curtail costs, Doc. 19 at 34, must be rejected because it is also a mere disagreement with the agency's decision. *See Hawaii*, 585 U.S. at 708. Indeed, Plaintiffs' extensive citations to audit and calculation requirements for indirect costs confirm the wisdom of the DOE's decision to reduce difficult-to-oversee indirect costs "to improve efficiency and curtail costs." Moreover, the use of audits would not even address the other reason for the DOE's new indirect costs policy: the policy of focusing grants on direct funding of the research the DOE has chosen to fund. Doc No. 2 at 1. An agency is not required to address every conceivable hypothetical solution, especially where the solution would not address all of the agency's concerns. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004)) ("It is not for [the court] to 'second guess'" what the agency chooses to prioritize"). Although Plaintiffs couch their argument as a failure to explain something, in reality it is Plaintiffs' attempt to substitute their judgment for that of the agency. This is impermissible.

5.      Plaintiffs' fifth argument, that DOE failed to recognize the reliance interests at issue, relates only to existing grants because Plaintiffs can have no legally protectible reliance interests in grants that they have not yet been awarded. *See Nat'l Org. of Veterans' Advocs., Inc.*

*v. Sec'y of Veterans Affs.*, 927 F.3d 1263, 1269 (Fed. Cir. 2019) (holding amendment to Veterans Affairs' regulations "[did] not defeat veterans' reliance interests" because the amendment "applied only prospectively"). And even as to existing grants, Plaintiffs' invocation of reliance interests is unavailing because as stated above, DOE recognized and accounted for reliance interests. Plaintiffs may not like the agency's conclusion that Plaintiffs' reliance was outweighed by the agency's responsibilities and policy determinations, but Plaintiffs cannot substitute their judgment for the agency's. *See Am. Petro. Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1066 (10th Cir. 2023) ("Though an agency must adequately consider any 'legitimate reliance' on an existing policy, such reliance is not 'necessarily dispositive' to the agency's decision"; "an agency may conclude, for instance, that reliance interests were 'entitled to no or diminished weight' or outweighed by 'other interests and policy concerns'") (quoting *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020)); *Calixto v. Walsh*, No. 19-1853, 2022 U.S. Dist. LEXIS 174212, at *49 (D.D.C. Sep. 23, 2022) ("Even if the agency considers the reliance interests to be serious, it my nonetheless determine that other interests and policy concerns outweigh any reliance interests.") (cleaned up).

      **6.**      Finally, Plaintiffs argue the Policy Flash is arbitrary and capricious because it applies only to IHEs, and not all grants. Doc. 19 at 35-36. But even where regulatory obligations are involved, agencies need not address every potential issue "in one fell swoop." *Env't Def. Fund v. Env't Prot. Agency*, 922 F.3d 446, 457 (D.C. Cir. 2019) (quoting *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004)). "It is not for [the court] to "second guess'" what the agency chooses to prioritize. *Id.* Moreover, as Plaintiffs acknowledge, the DOE's press release accompanying the Policy Flash explains that, "[a]ccording to DOE data, the average rate of indirect costs incurred by grant recipients at colleges and universities is more than 30%, a significantly

higher rate than other for profit, non-profit, and state and local government DOE grant awardees."[8] Schreiber Decl., Exh. B.  It therefore was perfectly reasonable—and certainly not arbitrary and capricious—for the DOE to apply its new rate to IHEs, given its policy objectives of focusing on the direct funding of research, improving efficiency, and reducing costs.

In sum, DOE considered the relevant issues and offered a reasoned and rational justification for its Policy Flash.  That Policy Flash is sensible, and it certainly sets out a reasonably discernible path, *see Fox*, 556 U.S. at 514 (quotation marks and citation omitted), that meets the "minimum rationality standard."  *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted). The Court therefore should resist Plaintiffs' calls to "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### C.    The Policy Flash is consistent with statutes authorizing DOE to make grants.

As Plaintiffs note, "DOE awards grants pursuant to various statutes."  Doc. 19 at 36.  *See, e.g.*, Department of Energy Organization Act, Pub. L. 95-91, § 646 (codified at 42 U.S.C. § 7256); Energy Policy Act of 2005, Pub. L. 109-58, § 901 *et seq.*.  These statutes confer broad grantmaking authority on the DOE, without imposing any requirements for the treatment of indirect costs. Plaintiffs take the wrong lesson from these statutes:  While Plaintiffs would apparently insist that they do not "authorize the" Policy Flash, the truth is that they give the DOE broad discretion in making grants *without foreclosing the* Policy Flash.  *See Lincoln*, 508 U.S. at 192 (recognizing that so long as the agency abides by relevant statutes and self-imposed regulatory obligations, the

---

[8] Press Release, DOE, *Department of Energy Overhauls Policy for College and University Research, Saving $405 Million Annually for American Taxpayers*, https://www.energy.gov/articles/department-energy-overhauls-policy-college-and-university-research-saving-405-million#:~:text=In%20a%20new%20policy%20memorandum,DOE%20research%20funding%20to%2015%25.  As just two examples, Cornell University's current negotiated indirect cost rate is 67%, Doc. 2-4 ¶ 13, while Tufts University's is 57%.  Doc. 2-19 ¶ 4.

"courts [have] no leave to intrude"). Indeed, that broad discretion is precisely why the Policy Flash is committed to agency discretion and thus not reviewable under the APA.

Plaintiffs' remaining arguments fare no better. For example, Plaintiffs invoke 41 U.S.C. § 4708 but, as already discussed, the Policy Flash is perfectly consistent with that provision. *See supra* at Part I(C)(2).

That leaves Plaintiffs to invoke the major questions doctrine, contending that, despite giving the DOE discretion to make grants, Congress did not intend to give the DOE power to determine what those grants would pay for. That is plainly incorrect. If Congress intended to provide a block funding award to a particular IHE, it would earmark money for that IHE. The provision of grantmaking authority to DOE plainly includes the provision of discretion to the DOE in how to achieve the purposes of the grant—here, by channeling taxpayer money directly to research rather than overhead.

Besides, Plaintiffs' argument has no stopping point: On their logic, the DOE could be held incapable of declining to fund certain projects because the power to refuse funding is "sweeping" and of great "economic and political significance." Doc. 19 at 37 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)). And in any event, the DOE's long-exercised power to decide how best to allocate research funding is wholly unlike the policies that have been invalidated under the major questions doctrine. *See EPA*, 597 U.S. at 725 (shifting energy market "from dirtier to cleaner sources"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000) (newly claimed power to regulate the tobacco industry).

### D.    The Policy Flash complies with requirements for grant terminations.

The plain text of 2 C.F.R. § 200.340(a) forecloses Plaintiffs' argument that the Policy Flash somehow violates the regulation governing grant terminations. That provision specifically provides that an award may be terminated if the "award no longer effectuates the program goals

or agency priorities." While Plaintiffs suggest that fiscal concerns do not fall within the scope of the regulation, Doc. 19 at 29, nothing in the regulation somehow excludes fiscal priorities from the "agency priorities" that can serve as a basis for termination. In fact, section 200.340(a) does not contain *any* prohibitions on the types of goals or priorities that the agency may consider.

Plaintiffs invoke two other provisions in challenging DOE's ability to terminate existing grants with indirect cost rates higher than 15%. *First*, Plaintiffs turn to 2 C.F.R. § 200.414(c)(4), which requires that a notice of funding opportunity include "policies relating to indirect cost rate reimbursement." As already explained, that provision cannot be a basis for invalidating the Policy Flash. *See supra* at Part II(A)(4). As relevant to termination, section 200.414(c)(4) is disconnected from, and does not purport to limit, an Agency's power to terminate a contract—and should not be stretched to tie the Government to grants that no longer serve its interests. At most—a point Defendants do not concede—a violation of section 200.414(c)(4) might render any particular termination a breach of contract, but that is no basis for compelling the Government to continue performing a contract that no longer serves the public interest. *See supra* at Part I(B). *Second*, Plaintiffs refer to Appendix III to Part 200, which states that "Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award." Appendix III(C)(7)(a). But that Appendix likewise does not purport to limit an agency's power to terminate an award. Moreover, it explicitly notes that a new, non-negotiated rate may be imposed during "the life of the federal award," if Section 200.414(c)(1) is satisfied, as it is here.

E.    **The Policy Flash is not impermissibly retroactive.**

This Court should reject Plaintiffs' argument that the Policy Flash is impermissibly retroactive. Doc. 19 at 37-38. As an initial matter, Plaintiffs' argument applies only to any existing grants that the agency may terminate. Of course, the agency's intent to use certain indirect cost rates for new, future grants cannot be retroactive.

30

Plaintiffs' argument fails for existing grants because the Policy Flash does not retroactively change the terms of any grant. This case is unlike the cases cited by Plaintiffs, in which an agency attempted to claw back money that already had been paid out. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Brimstone R.R. & Canal Co. v. United States*, 276 U.S. 104, 122 (1928). The Policy Flash proposes no such thing; it simply announces an intent to take subsequent actions that will terminate certain grants moving forward. That is a prospective action.

Plaintiffs' assertion that any resulting terminations would be impermissibly "retroactive" would render Section 200.340(a)(4) a nullity and make it impossible for the United States to terminate ongoing grants (or, for that matter, other contracts)—any such termination could be deemed impermissibly retroactive on Plaintiffs' theory. Moreover, Plaintiffs' theory contradicts clear Supreme Court precedent that recognizes every contract includes a promise either to perform as agreed, or to face remedies for breach for non-performance, *U.S. v. Winstar*, 518 U.S. 839, 919-20 (Scalia, J, concurring), and that agencies have the same rights as every party when they enter contracts. *Mobil Oil Expl. & Prod. Se. v. United States*, 530 U.S. 604, 607 (2000). Further, as explained above, the Court lacks jurisdiction to order the United States to specifically perform a contract, which is what Plaintiffs seek to secure by preventing termination. Accordingly, where the agency's implementing action is the termination of a contract, that action cannot be prohibited as impermissibly retroactive.

### III.    Plaintiffs Have Not Carried Their Burden To Show That They Face Likely Imminent Irreparable Harm Absent An Injunction.

The Court should deny Plaintiffs' Motion and vacate the existing TRO for the additional, independently sufficient reason that Plaintiffs have not carried their high burden of demonstrating irreparable harm. *See E.E.O.C. v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *In re TelexFree Sec. Litig.*, 4:14-MD-02566, 2021 WL 11604879, at *7 (D. Mass. April 21, 2021) (finding

likelihood of success on the merits but denying emergency relief for failure to show irreparable harm); *Doble Seis Sport TV, Inc. v. Puerto Rico*, 18-cv-1432, 2019 WL 1153432, at *5 (D.P.R. Mar. 12, 2019) ("Plaintiffs face a high burden of showing that irreparable harm will result. . . ."). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The irreparable harm must be "actual and imminent", not remote and speculative. *See Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991). And it must occur before the Court can adjudicate a preliminary injunction motion for a TRO, or before the Court can adjudicate the merits for a preliminary injunction. *See Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382-83 (1st Cir. 1987) (affirming denial of preliminary injunction in the absence of indication that the merits of the case would not be decided before harms occurred).

In considering whether Plaintiffs have met the "exceedingly high burden" of demonstrating that, absent the injunctive relief they seek, they are likely to suffer irreparable harm, the Court should not consider Plaintiffs in the collective. Instead, each Plaintiff—and each institution represented by a plaintiff—must on its own, make a clear showing of irreparable harm. *See, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485-86 (3d Cir. 2000) (partially vacating a preliminary injunction because "[i]nstead of making a case-by-case determination that each plaintiff demonstrated irreparable harm . . ., the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy the prong of the preliminary injunction test."). Plaintiffs' (and their member institutions') circumstances vary significantly, and the Court should require each Plaintiff (and member

institution) to meet this burden.  *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002).

A.    Plaintiffs' primary claimed injury—the alleged direct consequence of the Policy Flash—is that they will not receive the full amount of money to which they claim to be entitled under negotiated indirect cost rates.  But because that injury can easily be redressed if Plaintiffs succeed in this litigation—Plaintiffs could receive reimbursement for past indirect costs over the 15% cap if they prevail on their claims—preliminary relief is not warranted.  *See Blinds To Go, Inc.*, 370 F.3d at 162 (stating no irreparable harm where monetary award will make plaintiff whole).  And, while some Plaintiffs have recognized their ability to provide coverage for lost funding, *see e.g.* Doc. 2-16 at ¶ 17 (recognizing that University of Wisconsin-Madison can provide "limited bridge funding to grants on a temporary basis"); Doc. 2-12 at ¶ 19 (recognizing the existence of an endowment, though claiming reliance on same is not "sustainable"); Doc. 2-17 at ¶ 17 (same), the result would be the same even if Plaintiffs could *not* cover costs in the interim. *See United States v. Michigan*, 230 F.R.D. 492, 495 n. 1 (E.D. Mich. 2005) ("[Movant] argues that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.' The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it." (internal citation omitted)).

.    B.    For perhaps these reasons, Plaintiffs rely on a variety of alleged harms that are downstream of the delayed payment of money—things they claim *could* happen if they do not enjoy continued access to their current level of funding of indirect cost rates with the public's money.  These varied claims of irreparable harm are insufficient for several different reasons.

*First*, many of Plaintiffs' claimed harms categorically do not qualify as irreparable harm. For example, Plaintiffs assert that a reduction in indirect cost rates will harm the economy and the United States' competitiveness on a global scale. *See, e.g.*, Doc. 2-6, ¶ 24 (referencing a reduction in "[t]ourism dollars tied to MIT flow to Cambridge and Massachusetts economies"); Doc. 2-9, ¶ 26 (referencing a reduction in the "next generation of researchers in areas vital to the United States' economic and security interests"); Doc. 2-10, ¶ 13 (referencing a reduction in the "U.S. workforce needed to remain competitive in emerging technologies critical to U.S. national security"). Plaintiffs also claim a reduction in indirect costs will hamper scientific research generally.  Doc. 19 at ¶¶ 39-42. But those sorts of considerations—which really speak to the public interest factor in any event—properly belong to the democratically elected President and his Administration, not Plaintiffs seeking more money from the public fisc.  *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (looking to what "the President—the Commander in Chief—has determined" is in national security interests when evaluating injunctive relief); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 114 (D.D.C. 2020) ("courts typically defer to the President's judgment" when parties dispute "that a preliminary injunction would displace and frustrate the President's decision on how to best address a national security threat"). Here, DOE's action reflects what the Administration believes will best promote national interests, including national security.  The court should defer to the Executive Branch's determination about what is in the public interest. And Plaintiffs' repeated allegations and declarations speculating on the long-term effects of DOE's action on the local economy or national security only further demonstrate that their alleged harms are not imminent.

*Second*, Plaintiffs' allegations of irreparable harm are speculative.  A plaintiff seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction.

*See Blinds To Go, Inc.*, 370 F.3d at 162.; *see also Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy").  Here, nearly every Plaintiff has underscored the *possibility* of harm, without going so far as to say it will occur.  For example, many declarants assert that they will have to "consider" layoffs.  *See e.g.* Doc. 33-1 at ¶ 7; Doc. 33-2 at ¶ 6; Doc. 2-6 at ¶ 16.  As another example, one declarant asserts that member institutions "*may* also have to reduce the amount of equipment, labor, and local services used to maintain its facilities, lowering the overall economic activity in the local area."  Doc. 2-3 at ¶ 18 (emphasis added).  Another alleges that "[l]oss of funding *may* jeopardize the ability of these young engineers and scientists to complete their training."  Doc. 2-10 at ¶ 13 (emphasis added).  This is language of mere possibility, not likelihood, and it cannot support injunctive relief.  *See Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) (holding that "irreparable harm is not assumed; it must be demonstrated") (quoting *Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)).

*Third*, where declarants assert that reducing funds is likely to harm research, innovation, or retention, they generally do not assert that those harms are *imminent* as opposed to eventual reductions in their capacity that would occur from sustained diminished funding after a ruling on the merits.  *See Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (affirming denial of preliminary injunction in the absence of indication that the merits of the case would not be decided before harms occurred).  *See also e.g.* Doc. 2-6 ¶¶ 22-23 ("Over time, the DOE cuts would also degrade MIT's advanced research capacity"); Doc. 2-12 at ¶ 17 ("Perhaps most harmful is the contraction in Caltech's ability to train the energy researchers of the

future"); Doc. 2-10 ¶ 13 ("Ultimately, loss of funding will jeopardize UPENN's ability to sustain, support, and develop the U.S. workforce[.]").

      **C.**     All of this remains true with respect to future grants which—tellingly—Plaintiffs minimally discuss in alleging that DOE has caused them irreparable harm. Doc. 19 at 44. Obviously, a party that cannot show irreparable harm arising from the delayed payment of funds with respect to current grants cannot show irreparable harm based on grants that do not yet exist. Moreover, there is no stopping point to this argument: If a plaintiff's desire for a future government grant or contract, or a future government grant or contract with more advantageous terms, qualifies as irreparable harm, the irreparable harm element would be automatically met in every case involving a potential future government grant or contract. That is not the law: Irreparable harm must be proved. *See Arab World, Inc.,* 645 F.3d at 26. And, in any event, a showing of irreparable harm limited to future grants would support injunctive relief only with respect to future grants— and not existing grants. *See Tamko Roofing Prods., Inc.*, 282 F.3d at 40. But Plaintiffs' Motion should be denied in full because they have not shown irreparable harm with respect to any grants.

**IV.**    **Injunctive Relief Is Not In The Public Interest.**

      As Plaintiffs acknowledge, the "public interest" element merges with the likelihood of success on the merits in cases where the Government is a party. *See* Doc. 19 at 44. Because Plaintiffs have not shown a likelihood of success on the merits, they likewise have failed to show that an injunction would be in the public interest. But two additional points are worth noting:

      *First*, as the Supreme Court recently held in *California*, the public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. 145 S. Ct. at 968-69. While the DOE could adjust payments to reimburse grantees in the event Plaintiffs prevail in this lawsuit, the Government has no ready means of recouping moneys wrongly paid out to

Plaintiffs under an injunction.  An injunction thus would harm the public interest.  *See Heckler v. Turner*, 468 U.S. 1305, 1307-08 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay of injunction).

*Second*, as already discussed, Plaintiffs' argument on irreparable harm largely seeks to impose their assessment of what is in the public interest in place of the views of the President and those he has selected to serve in his Administration.  Under our representative system of Government, that gets things exactly backward.  *See supra* at Part II(B)(3).  Even if it finds Plaintiffs' views sympathetic, the Court should not substitute Plaintiffs' views concerning what would best serve the public interest for the views of the Executive Branch.

**V.    Even If the Court Declines To Vacate The Existing TRO In Its Entirety, The Court Should Vacate It In Part Because It Is Overbroad.**

For the reasons explained above, Plaintiffs are not entitled to a TRO.  But in the event the Court concludes otherwise, the Court should vacate the TRO in part.

"Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs[.]"  *Tamko Roofing Prods., Inc.*, 282 F.3d at 40 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 7 (1st Cir. 2019). Thus, courts must "closely tailor injunctions to the harm that they address."  *Tamko Roofing Prods, Inc.*, 282 F.3d at 40; *see also Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) ("[I]njunctive relief must be tailored to the specific harms alleged, and an overbroad preliminary injunction is an abuse of discretion.").

Here, Plaintiffs seek, and this Court has granted, a universal TRO.  Docs. 3, 34.  Defendants contend that universal injunctive relief is an improper exercise of judicial authority: Universal injunctions violate Article III, stretch traditional principles of equity (including those just discussed) past the breaking point, and "take a toll on the federal court system—preventing legal

questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see also Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 431 (3d Cir. 2020) (vacating nationwide injunction and remanding for entry of relief limited to successful as-applied plaintiffs).[9]

Here, the Court should limit any remedy to those plaintiff institutions, or institutions represented by plaintiff associations, that the Court concludes have shown irreparable harm warranting injunctive relief. As noted, universal injunctive relief is improper. And Plaintiffs in any event have not offered any argument purporting to justify their request for universal relief. The Court therefore should tailor any injunction to the irreparable harms proved (and the grantees that proved it).

## VI.    The Court Should Stay Any Order for Preliminary Relief and Order That Plaintiffs Post Bond.

Based on the arguments in this Opposition, and due to the extraordinary breadth of the relief sought in Plaintiffs' motion, the United States respectfully requests that the Court stay any TRO or preliminary injunction pending the disposition of any appeal that is authorized.[10]  At a minimum, the Court should administratively stay any order granting Plaintiffs' motion for seven days to allow an opportunity to seek an emergency, expedited stay from the Court of Appeals, if an appeal is authorized.

---

[9] A challenge to the appropriateness of universal injunctive relief is currently pending at the Supreme Court. *Trump v. State of Washington*, 24A885 (S. Ct., filed March 13, 2025).

[10] On April 16, this Court entered a TRO without briefing from the Defendants. *See* Fed. R. Civ. P. 65(b). By the time this Court holds its hearing on April 28. Defendants will have been subject to a TRO for 12 days, almost all of the 14-day period contemplated in Rule 65(b)(2). And this Court will have received a full round of briefing on the merits of the parties' dispute. Regardless of the label Plaintiffs use, this matter is now effectively in a preliminary injunction posture. *Cf.* Fed. R. Civ. P. 65(b)(3).

Moreover, if the Court decides to continue the TRO or grant preliminary injunctive relief, the Court should order Plaintiffs to post a bond equal to the likely amounts of any disbursements during the pendency of this ligation, that they are likely to collect during the pendency of the TRO or preliminary injunction. Defendants are currently analyzing the data supporting the amount of any required bond, and they will set out their position in a court filing if the Court orders continued injunctive relief.

Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c); *see also iQuartic, Inc. v. Simms*, 15-cv-13015, 2015 WL 5156558, at *6 (D. Mass. 2015) ("A movant for injunctive relief must give security in an amount that the Court considers proper to pay costs and damages sustained by any party found to have been improvidently enjoined.").

"Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully. The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction." *Glob. Naps, Inc. v. Verizon New England, Inc.*, 489 F.3d 13, 21–22 (1st Cir. 2007) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)).

As the party seeking security, Defendants need only establish a "rational basis" for the amount of the bond. *Int'l Equity Inv., Inc. v. Opportunity Equity Partners, Ltd.*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006); *cf. Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 159–60 (2020) (requiring security in the amount of $42 million and explaining that "some degree of uncertainty or speculation is inherent in defendant's attempt to quantify the harm it may suffer as

a result of the preliminary injunction").  Although the amount of an injunction bond is within the Court's discretion, when setting security, courts "should err on the high side" because setting a bond amount too low might produce injury since "the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).  "An error in setting the bond too high . . . is not serious" because, if the preliminary injunction is subsequently found wrongful, the defendant does not automatically recover the entirety of the bond amount, but instead must "prove its loss, converting the 'soft' numbers to hard ones." *Mead*, 201 F. 3d at 888.  On the other hand, "an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

## CONCLUSION

Defendants respectfully request that the Court dissolve the temporary restraining order and deny Plaintiffs' Motion.

Dated: April 22, 2025                                    Respectfully submitted:

                                                         LEAH B. FOLEY
                                                         United States Attorney

                                                         BRIAN C. LEA
                                                         Deputy Associate Attorney General

                                                    By: /s/ *Nicole M. O'Connor*
                                                         Nicole M. O'Connor
                                                         Assistant United States Attorney
                                                         United States Attorney's Office
                                                         John Joseph Moakley U.S. Courthouse
                                                         1 Courthouse Way, Suite 9200
                                                         Boston, MA 02210
                                                         (617) 748-3112
                                                         nicole.o'connor@usdoj.gov

                                                         *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: April 22, 2025                    */s/ Nicole M. O'Connor*
                                         Nicole M. O'Connor
                                         Assistant United States Attorney